PYMAN and others *v.* VON SINGEN and others.

*(District Court, D. Maryland.* September 7, 1880.)

1. SEAWORTHINESS—PRESUMPTION.—It is an ordinary presumption that a ship is seaworthy and her machinery in good order when she undertakes a voyage.

2. SAME—SAME—REBUTTAL.—This presumption is not rebutted, where it is shown that a ship not two years old, and carrying ballast only, was disabled within 36 hours after leaving port, by the loosening of the bolts of the propeller's shaft, from the racing of the propeller during a gale, although there was no testimony that the bolts were specially examined just previous to starting.

3. NEGLIGENCE—BOLTS—RIMERS.—The fact that the ship was not provided with rimers for boring out the bolt holes after they had worked out of shape, and extra bolts to fit them, so that the difficulty might have been remedied at sea without putting into port, did not constitute negligence.

In Admiralty. Libel by owners of steam-ship Netley Abbey against charterers for damages resulting from refusal to load steamer.

*A. Stirling, Jr.,* for libellant.

*John H. Thomas,* for respondents.

MORRIS, D. J. On August 16, 1879, the British steamship Netley Abbey, 1,113 tons, was in the harbor of Newport, in England, near Cardiff, and on that day the agents of the libellants, who are the owners of the steamer, chartered her to the respondents, who are merchants of Baltimore, to come to Baltimore and load a cargo of grain for Great Britain or the continent.

The clause of the charter-party involved in this suit is as follows: "The said steam-ship being tight, staunch, and in every way fitted for the voyage, with liberty to take outward cargo to Baltimore for owner's benefit, shall, with all convenient speed, sail and proceed to Baltimore, *where she guaranties to be in time for loading first half of September, 1879; the act of God, restraints of princes and rulers, dangers of the seas and navigation, accidents to boilers, machinery, etc., always excepted."* The steamer had arrived at Newport from Carthagena, in Spain, on the ninth of August, with a cargo of iron ore, and having finished discharging that cargo on the twenty-first of August, and having taken on her coals and ballast, she proceeded to sea about midday of the twenty-third of August. She had moderate weather for the first 24 hours. Then the wind increased to a gale, with very heavy sea, which had continued for about 12 hours, when the engineer reported that some of the bolts connecting the after sections of the propeller or tunnel shafting were loose. The ship was hove to and the bolts were driven up, and the nuts tightened, and the ship started again at half speed. The heavy sea continued, causing the ship to labor, and the propeller to race.

About midday on the 26th, the bolts having again worked loose, the ship was hove to and the bolts taken out. They were found to be worn and the holes enlarged. Attempts were made to remedy the trouble by lining the holes and driving the bolts up tight, but upon starting the ship again and finding that the bolts did not remain tight, the engineer reported that it was not safe to proceed on the voyage. The ship was headed for St. Michaels, in the Azores, where she arrived on the 31st. Repairs to the bolts and bolt holes were at once made, working night and day, and the vessel was in condition to start again on her voyage on the third of September. She had the usual voyage from St. Michaels to Baltimore, arriving on the sixteenth of September, and was ready to receive her grain cargo on the 18th, having been delayed in all about seven days by reason of the accident and repairs. The charterers had engaged the steamer to carry a cargo of grain, which they were under contract to load during the first half of September, and as she was not ready to load within the time specified they refused to accept her, upon the ground that she was not delayed by accident to her machinery within the meaning of the exception in the charter-party; and they now allege, in defence to this action, that the steamer was not seaworthy or fitted for the voyage when she started from Newport; that no examination of her machinery was made before she started on the voyage, and that very soon after she started parts of her machinery were found to be loose and out of order in particulars which could easily have been discovered and rectified if proper examination had been made and proper precautions taken before she started; and that the failure of the steamer to arrive in Baltimore in time to load during the first half of September was caused either by the condition of her machinery before she started on the voyage, or by the want of proper care, watchfulness, and skill during the voyage.

The bolts, the loosening of which disabled the steamer, are the pins which connect the sections of the shaft which operates the screw. It is a heavy shaft, made in three sections, which are coupled together by collars welded to each end,

through which there are six bolts. The bolts in this instance were tapering, with the holes made to fit them, and were intended to be driven in and the nuts screwed further down, so as to tighten them up if they should work loose. The testimony of all the experts—marine engineers, quite a number of whom were examined on both sides—shows that if these bolts become at all loose there is an observable difference in the noise made by the working of the shaft, which is at once perceptible to an attentive engineer. It is insisted, on behalf of the steamer, that as the testimony shows that no such noise or jar was noticed, either previous to her anchoring at Newport, at the end of her last voyage, or when she started on the voyage to Baltimore, and not until she had been at least 36 hours at sea, it is evident that the bolts must have been tight when she started, and that this must be presumed, even though there is no testimony that the bolts were specially examined just previous to her starting.

The chief engineer, who had been on the steamer for six months, testified positively that the machinery was in good order at the end of the previous voyage, and that when the steamer started for Baltimore the machinery gave no evidence of being out of order, and that the least perceptible loosening of the bolts would have been noticed by him as soon as the machinery was in motion. The ordinary presumption is that a ship is seaworthy and her machinery in good order when she undertakes a voyage. The respondents, to rebut this presumption, endeavor to show that the machinery broke down soon after she got to sea, without any sufficient stress of weather or any extraordinary circumstance to account for it. On the voyage to Baltimore the steamer was carrying ballast merely. The weather was moderate for 24 hours, and during that time the machinery worked well. Then ensued a strong gale, with heavy seas, and the steamer being light her propeller was constantly lifted clear of the water, and meeting no resistance it revolved rapidly, commonly called racing, and when it struck the water again its velocity was suddenly checked. The effect of this, constantly repeated, was to bring an irregular strain upon the shaft, tending to loosen the bolts

of the couplings; and when they are once loosened the testimony shows that the wear both upon the bolts and holes is very rapid. This is the explanation given by the officers of the steamer of the cause of the disabling of the machinery, which delayed her.

The testimony of the numerous marine engineers who were examined as experts shows that this is an accident which seldom occurs, but there is proof that it has sometimes happened; and, while many express the contrary opinion, quite a number of these experts state that the circumstances of the voyage as detailed in the testimony of the officers of the steamer are sufficient in their judgment to account for the accident, even though the bolts had been in proper condition when the steamer started, and every care and precaution had been exercised. The Netley Abbey appears by the charter-party to have been built in 1878, and was therefore, at the date of the contract, not two years old, and it was hardly to be expected that her machinery needed such an examination, before starting on the voyage, as could only be had by taking the bolts out and replacing them; and as the shaft worked smoothly, without jar or noise, at the end of the previous voyage and at the commencement of this, I am not at all inclined to think that an examination in port, such as is usually made before starting, would have disclosed any looseness or defect, and I am not satisfied that under all the circumstances I should be justified in holding that the presumption of seaworthiness has been overcome.

The respondents impute to the libellants as negligence that the steamer was not provided with rimers for boring out the bolt holes after they had worked out of shape, and extra bolts to fit them, so that the difficulty might have been remedied at sea without putting into port.

It would appear, however, from the testimony of experts, that it would have been almost impossible to rime out the holes at sea, with the vessel in constant motion; and as it could not be foreseen what sized holes would result from the riming, a great variety of bolts would have to be provided, and they testify that such provision is never made.

A question is raised in the answer of the respondents with regard to the validity of the charter-party. It purports to have been signed by certain ship-brokers in Philadelphia, who profess to act under cable authority from other ship-brokers in England, who are described as the agents of the owners.

It is shown by the testimony that the owners ratified the act of their ship-brokers by at once instructing the master of the steamer to proceed to Baltimore to load under the charter, and I think it sufficiently appears that the owners adopted the charter made in their behalf, and were bound by it and could have been held to its performance.

Upon consideration of all the testimony I am of opinion that the non-arrival of the steamer within the time specified was due to accident to her machinery within the meaning of the exception in the charter-party, and I will sign a decree against the respondents for the damages resulting to the libellants from their refusing to load the steamer.