LA FERNIER *v.* SOO RIVER LIGHTER & WRECKING CO.

1. NEGLIGENCE—PRESUMPTIONS—EVIDENCE.

   Although negligence will not be presumed from the mere fact of an accident, such fact may be taken into consideration, in connection with all the other facts and circumstances, in determining whether negligence existed.

2. SAME—SEAWORTHINESS OF VESSEL.

   The presumption that a ship was seaworthy when she undertook a voyage may be overcome, not only by direct proof, but by circumstances.

3. SAME—DEATH OF SEAMAN—LIABILITY.

   During the year preceding the last voyage of a 36-year-old vessel, she leaked so badly that she was allowed to sink at her moorings, and to remain in that condition until the following spring, when she was raised, and less than $100 in repairs put upon her. She was not in commission during the following summer, but floated light, exposed to sun and wind. Upon her first voyage thereafter she still leaked badly, even before she was loaded, and, while being loaded, the leakage increased with the load. Upon her return voyage, when only two-thirds loaded, in smooth water with a light wind, without collision, she sank. Her captain testified that he did not know why she sank, and called the accident a dispensation of God. *Held*, in an action for the death of the vessel's fireman by drowning, that the evidence was sufficient to justify a finding that she sank because she was unseaworthy.

Error to Chippewa; Steere, J. Submitted January 31, 1902. Decided March 4, 1902.

Case by Amable La Fernier, special administrator of the estate of John Roberts, Jr., deceased, against the Soo River Lighter & Wrecking Company, for negligently causing the death of plaintiff's intestate. From a judgment for plaintiff, defendant brings error. Affirmed.

*Warner & Sullivan* (*Goulder, Holding & Masten*, of counsel), for appellant.

*Alexander R. Macdonell*, for appellee.

Moore, J. This case was tried before the circuit judge without a jury, who rendered a judgment in favor of plaintiff for $1,900. The case is brought here by writ of error. The circuit judge was requested to make special findings of fact and conclusions of law. As they state the questions involved, we quote them:

"Plaintiff sues in the capacity of special administrator of the estate of John Roberts, his son-in-law, who was drowned September 25, 1898, while in defendant's employ, by the sinking of one of defendant's boats in the upper St. Mary's river. Defendant is, and was during the year 1898, a corporation organized under the laws of the State of Minnesota, but doing most of its business in Michigan, on the St. Mary's river, engaged in lightering and wrecking, with headquarters at Sault Ste. Marie, where its lighters and other wrecking outfit were stationed, and have been stationed for several seasons.

"The boat called the Monitor, through the sinking of which deceased met his death, was owned by defendant, and used as one of its wrecking lighters. She was 36 years old, formerly a sailing schooner on the Lakes, had passed from that to a tow barge in the lumber trade, and at the time of her sinking had been stripped of her sails and sailing rigging, dismantled as a sailing vessel, equipped with pumps, hoisting machinery, and other suitable wrecking outfit, and converted into a wrecking lighter, in which capacity she was used from time to time for several seasons as opportunity offered. This work of converting her into a wrecking lighter was done in 1894, at which time she was overhauled, given new decks and deck beams, some new stanchions and parts of new frames put into her, and some new short pieces of planking put upon the outside. She was somewhat hogged; was a boat of 26-foot beam, 136 feet long, had four hatches, a tonnage of 298 net tons and 314 gross tons, and an estimated carrying capacity of 536 tons. She was an enrolled vessel, and her owners continued to take out the same license for her under the United States laws as she formerly had when a sailing schooner; but she had no propelling appliance of her own, and was towed from place to place when in use. She is described in her last license as the 'schooner Monitor,' with Alex. McDougal as master.

"In the summer of 1897, some calking was done upon her above the water line, and her decks were tarred. She

was also painted in 1896 and 1897. In the fall of 1897, having been towed through the ice for some distance, by which her calking was somewhat loosened, she was found to be leaking badly, and was allowed to sink at her mooring in shoal water, and rest upon the bottom until spring, when she was pumped out and calked again where the ice had pulled the oakum out of her seams. In June, 1898, it being found that she still leaked, she was placed in the dry dock at Bay City and calked over her bottom and three seams above the light water line, 13 calkers working on her for one day. Her planking was of white oak, and below the water line was sound. The cost of dry docking and calking her was $138. She was then returned light to her station at Sault Ste. Marie, and did not leak on the trip back. After her return, some calking and painting was done on her above the light water line. Some of her planking had been patched with short pieces, and in places was dozy around the spikes. Some of her upper seams were more or less open, and the calking defective. She was used only at intervals, mostly in the fall, and had not, before the work she entered upon at the time she sank, been engaged in any work during that season. When not employed, which was most of the time during the summer, she lay in ordinary, unladen, high out of the water, and exposed to sun and wind. No crew was kept upon her, except a watchman or shipkeeper, who pumped her out and wet her down at times. She was equipped with sounding wells, had two siphons with two-inch discharge and an inch steam pipe, two hand pumps, a canal pump, two hoists and engines, and other wrecking paraphernalia. When in use she had no anchors, no boats, no crew list or shipping articles, and no life-saving appliances, except three or four life preservers in one of the rooms.

"On September 23, 1898, the steam barge Orr and consort, Carrington, were aground, iron ore laden, on a shoal in the upper St. Mary's river above Round Island, and defendant's wrecking outfit was engaged to go to their relief. Two lighters, the said Monitor and the Monterey, with about 30 laborers on board, were taken to the distressed vessels in tow of the tug Ruth. John Roberts, the deceased, was one of these laborers, and was hired for and acted as fireman during the trip. Capt. William W. Smith, who was the general manager of the Soo River Lighter & Wrecking Company and one of its stockholders, was in charge of the expedition, and acted as

captain and master on the Monitor. After arriving at the wreck, the Monitor lay alongside the Carrington, employed in lightering her cargo. The laborers who had been brought along were put into the hold of the Carrington, shoveling ore into buckets, which transferred it into the hold of the Monitor by the use of her derricks. This work was continued without interruption until about 12 o'clock midnight of the following Saturday, when the stranded vessel floated. In the meantime, the Monitor had lightered and emptied into her own hatches ore estimated by Capt. Smith at 350 tons; there being no exact data of the amount, the tally which was kept having been lost in the wreck. The forward hatch was loaded last, and at the conclusion of the loading she was somewhat down by the head. The water was smooth during the lightering, there being no wind or sea which delayed them, and the men worked steadily night and day for nearly 36 hours, only stopping for meals; but, at the time the stranded vessel floated, the wind had commenced blowing some from the northwest, and it was deemed best to take the Monitor to a less exposed position for reloading the cargo of ore into the Carrington.

"About 3 o'clock Sunday morning of September 25, 1898, the Monitor, in tow of the tug Ruth, left the Carrington for down the river with the loaded ore on board. Capt. Smith was on deck, in charge, and at the wheel. When they started, he ordered all the hands but one to go below and go to bed, and get some rest during the trip down, as they were exhausted and in need of sleep, and would be required, on the arrival down in the morning, to return the lightered ore to the Carrington. One man, Hugh Amos by name, one of the laborers, who went as an engineer to run a hoisting engine, and who was not a sailor, was kept on duty to stand watch. He was told by Capt. Smith to keep steam up in the small boiler used for hoisting, to look after the siphon and see if there was any water in the boat, and to get a messenger ready to take the tow line from the tug. After leaving the Carrington and starting down the river, Capt. Smith and Amos were the only persons on deck. All the others were asleep in the cabin. After she had been towing behind the tug for several miles, and while it was yet dark, but just breaking day in the morning, the Monitor settled by the head and sank in a few minutes in about 26 feet of water. She did not appear to strike the bottom or any obstruction before she sank. She

was at that time in a sheltered place, and it was comparatively calm; only a fresh breeze blowing from the northwest, and no sea running sufficient to cause any inconvenience. The disaster was so sudden that there was little time to do anything. Capt. Smith kicked in the cabin windows and shouted to the sleeping men, but could do no more before the water rose and drove him up the shrouds. Five men, including John Roberts, the deceased, were caught by the water in the cabin and drowned before they could escape. The others were picked up by the tug. At the time she sank, Capt. Smith was steering aft on the poop deck behind the cabin. Where he stood the deck was raised 3½ feet above the main deck, and was 3½ feet below the top of the cabin, over which he could see the deck forward and the tug which was towing them. He didn't notice that she was sinking until Amos shouted the fact to him. Amos at that time stood on the farther forward deck behind the engine room, which was constructed upon the deck, and had been sent there by the captain to fix a messenger with which to haul in the tow line from the tug. He was so occupied in untangling a knot in the line that he did not even pay particular attention to the first rush of water through the bulwarks and over the deck, although he noticed it, and he only desisted from his work when the second wave swept over the vessel and drove him upon the rail. He then, as he was climbing up, shouted to the captain that the boat was sinking, whereupon the captain sought to alarm the men in the cabin.

"Some time after she had sunk, divers were sent up to examine the Monitor. She showed no signs of having been in collision with an obstruction, was found with her stem and stern resting on a bar, with room to pass under her amidships, her hull being unbroken and in as good condition as before she sank, except that there was from 4 to 6 feet of oakum out of her seams on one side, just about the bilge. During the trip up, the Monitor was siphoned out, and while she was at the wreck she leaked to some extent; her siphons being used from time to time. As she settled with the load she was taking on, the leakage increased. When she left the Carrington, one siphon was running all the time, and continued until she sank. During the trip down, no one investigated to see whether the water was gaining on the siphon or the siphon on the water.

"The conclusion is reached as a matter of fact that the ship sank by leakage, which arose from her age, unsoundness above the light water line, and unseaworthiness generally, together with the failure of those in charge to keep proper watch of the leakage and use proper appliances to keep her clear at a time when she was laden and towing. The sinking of the boat caused the death of John Roberts, deceased. He was a healthy, strong, able-bodied man, 27 years of age, and his expectancy of life, according to the mortality tables, was about 37 years. He was a common laborer, earning from $1.50 a day up when working for wages, which was about three-quarters of the time. He lived on a farm with his wife and three children; the oldest being now seven years of age, and the youngest three. His family had no other means of support, and it took about $250 per year to support them.

"All the files, records, and exhibits in this cause are hereby made a part of these findings.

### "CONCLUSIONS OF LAW.

"Capt. William W. Smith, a part owner and the manager of this defendant, was not a fellow workman of this deceased. He performed the functions and duties of the owners, and was their *alter ego.*

"It was the duty of the owners to maintain the boat in a safe and seaworthy condition, to exercise all reasonable precautions and vigilance to guard against leakage and to keep her free of water, and maintain proper watch while she was under way to discover any dangers which might arise and to warn the sleeping men, who had been ordered below to bed after their exhausting labors.

"The fact that she was in tow of a tug does not relieve the owners of their responsibility. While the tug and tow are treated as one vessel under some circumstances, a different rule prevails in many particulars where the tow is officered and manned by its own men and in their immediate charge. It was the duty of the owners to see that the tow was in a fit condition to be towed. It is true that the owners had seen fit to procure a license for this boat as a schooner, and had dismantled her as such, stripping her of her sails, rigging, anchor, lifeboat, and life-saving appliances; but having all those things would not have been of any use under the circumstances of this accident, had they been on board, and their absence contributed nothing towards the drowning. She had been converted

into a wrecking lighter, equipped with proper appliances for that purpose, and was being towed through quiet waters. It was the duty of the owners to see that she was in proper condition as such to be towed, and that a proper watch was kept to guard against accidents.

"On this trip down, she was loaded with iron ore, and gradually leaked to the sinking point. Then she suddenly plunged and sank. None of the perils of the sea, as usually understood, caused this. She encountered no storms; no wind, waves, hidden shoals, sunken rocks, or collision figured in the catastrophe. If she were staunch and sound in every particular, lightly laden, tightly calked, free from leakage and clear of water, properly manned, diligently watched over,—and the defendant claims the testimony shows she was,—her sinking as she did in those quiet waters, under the circumstances as detailed by defendant's own witnesses, would seem a miracle. In fact, in that connection, Capt. Smith tells us it was a miracle. He swears that it was a direct intervention of Divine Providence, and without any natural and apparent cause. While not disputing the existence of miracles, we are not at liberty to dispose of this case on that theory. The law made it the duty of the defendant to take all reasonable precautions for the safety of its employés, to see that the boat was reasonably safe and seaworthy for the service she was engaged in; that she was not overloaded; that the cargo was properly stowed; that proper precautions were taken to protect and guard against leakage, and a proper watch maintained, so that any danger could be timely discovered and the sleeping men aroused.

"This boat was old and infirm at best, converted from a sailing schooner to a tow barge, and then to a wrecking lighter. She had reached her last stage of usefulness. She had been lying light on her moorings most of the summer, her sides exposed to the sun and wind, and her seams drying. Her cargo of iron ore was dumped through each hatch in cone-shaped piles, the heaviest pile forward, and was untrimmed. No record was kept of the amount, and what tonnage she had on board was merely a guess. She leaked, and her leaking increased as her load settled her dried seams under water. When she started down the river, a siphon was running, and no one seems to have known whether or not it was gaining on the leakage. It was negligence under these conditions to send the exhausted

men to bed in the cabin after they had worked continually over 30 hours without rest or sleep, and then to undertake to navigate such a craft with only the man at the wheel and only a tired common laborer on deck to watch, and particularly when the laborer was put at work other than watching, which took him back of the engine room untangling a line, and where he could not early detect any danger which might arise. There was not a sufficient number of men on duty at proper stations and with proper skill for safely navigating this boat.

"The Monitor, on her last voyage, was under the management and control of its managing owner. The death of John Roberts, Jr., resulted through her sinking, and her sinking could have 'been avoided by the exercise of reasonable care and diligence. She sank from leakage due to her cargo, age, infirm condition, and unseaworthiness, and a failure to properly man and navigate her, and particularly a failure to keep a proper watch."

It is insisted by the defendant that the judge reached a wrong conclusion as to the facts, and, as he was wrong as to the facts, his conclusions of law were also wrong. In the oral argument, it was stated by the leading counsel for defendant that its chief cause of complaint might be found in the conclusion stated by the trial judge in the following language:

"The conclusion is reached as a matter of fact that the ship sank by leakage, which arose from her age, unsoundness above the light water line, and unseaworthiness generally, together with the failure of those in charge to keep proper watch of the leakage and use proper appliances to keep her clear at a time when she was laden and towing."

It is conceded that, if the ship sank because of leakage which arose from her age, unsoundness above the water line, and unseaworthiness generally, defendant is liable; but it is insisted there is no testimony upon which to base such a conclusion. It is also insisted that, if the failure of those in charge to keep proper watch of the leakage and use proper appliances to keep the vessel clear of water was an element in bringing about the result, this failure was the act of a fellow-servant, and there would be no liability. It is also said that, while no one can tell what caused

the vessel to sink, if the man placed on watch had done his duty, the deceased would have been wakened from his sleep in time to escape, and his death is due to negligence of a fellow-servant, and there is no liability.    It is argued that the mere fact of an accident does not indicate negligence; that in all cases there is a presumption that a ship, when she undertakes a voyage, is seaworthy,—citing *Werk* v. *Leathers*, 1 Woods, 271 (Fed. Cas. No. 17,415); *Pyman* v. *Von Singen*, 3 Fed. 802; *Stackpole* v. *Wickham*, 7 La. Ann. 678; *Pickup* v. *Insurance Co.*, 3 Q. B. Div. 594; *The Rover*, 33 Fed. 520; *The Piskataqua*, 35 Fed. 622; and that the uncontradicted testimony is that, when this ship undertook her voyage, she was seaworthy.

We cannot agree with counsel that the testimony is not contradictory.    While it is true that, simply because an accident has occurred, negligence is not to be presumed, still, in determining the question of negligence, the fact that an accident has occurred may be and should be taken into consideration, in connection with all other facts and circumstances of the case, for the purpose of determining whether in fact there was negligence.    It is also true that, when a ship undertakes a voyage, she is presumed to be seaworthy; but it is a presumption which may be overcome, not only by direct proof, but by circumstances. The case of *The Lizzie Frank*, 31 Fed. 477, is instructive. In that case it was held the ship was seaworthy, but there is a statement of the rule of law which applies to this case. We quote:

"On consulting the American authorities, we find it stated that the owner, among other obligations to the seaman, is bound to provide a seaworthy ship, and that this means that, at the commencement of a voyage, the ship shall be furnished with all necessary and customary requisites for navigation, or, as the term is, shall be found 'seaworthy.'    Seaworthiness includes a competent crew. Yet the owner does not warrant to each seaman the competency of the others.    *The E. B. Ward, Jr.*, 20 Fed. 704; *Dixon* v. *The Cyrus*, 2 Pet. Adm. 411 (Fed. Cas. No. 3,930).    There is no warranty that a crew shall not

be negligent, and such negligence is no breach of the implied warranty to provide a competent master and crew. 1 Pritch. Adm. Dig. 989.

"By seaworthiness is meant 'that the ship shall be in a fit state, as to repair, equipment, crew, and in all other respects, to encounter the ordinary perils of the contemplated voyage;' or, in the language of some of the authorities, 'that the ship is in a condition in all respects to render it reasonably safe where it happens to be at the time referred to;' or, as expressed by others, 'that the ship was, at the commencement of the voyage, in such a state as to be reasonably capable of performing it.' The question of seaworthiness is to be determined with reference to the customs and usages of the port or country from which the vessel sails, the existing state of knowledge and experience, and the judgment of competent persons versed in such matters.   *   *   *

"However, if a ship breaks in a vital part, and especially if it is an old ship, the presumption of seaworthiness, which ordinarily obtains, is rebutted. In such case the breaking may be evidence of unseaworthiness; but it is not sufficient to overcome the evidence to the contrary, such as we have in this case. See *Dixon* v. *The Cyrus*, 2 Pet. Adm. 411 (Fed. Cas. No. 3,930); *The Titania*, 19 Fed. 101; *The E. B. Ward, Jr.*, 20 Fed. 704; *Werk* v. *Leathers*, 1 Woods, 271 (Fed. Cas. No. 17,415)."

In *Gartside* v. *Insurance Co.*, 62 Mo. 322, it is said:

"It seems to be well settled that a ship sinking in port, or very soon after commencing its voyage, in which it meets with no extraordinary gales of wind or other disturbing elements, is presumed unseaworthy."

See *Goldsmith* v. *Henderson*, 50 Fed. 567. To the same effect are the many cases cited in 14 Am. & Eng. Enc. Law (1st Ed.), 372.

In *Mullen* v. *St. John*, 57 N. Y. 567 (15 Am. Rep. 530), in discussing the question of negligence, the court said:

"In the case at bar, the walls of the building, without any special circumstances of storm or violence, fell into the street. There was some evidence tending to show that it was out of repair. Without laying any stress upon the affirmative testimony, it is as impossible to conceive of this building so falling, unless it was badly constructed or

in bad repair, as it is to suppose that a seaworthy ship would go to the bottom in a tranquil sea and without collision."

In *Schoepper* v. *Chemical Co.*, 113 Mich. 582 (71 N. W. 1081), it is said:

"Defendant's counsel contend that the cause of this explosion is a matter of mere conjecture, and it is said by counsel that it is not enough for plaintiff to prove circumstances consistent with her theory, but that these circumstances, and each of them, must preclude any other rational conclusion. This we take to be but another way of stating the proposition that the proof must exclude all reasonable doubt. It is hardly necessary to say that no such rule obtains in civil cases. It is true that where an injury occurs that cannot be accounted for, and where the occasion of it rests wholly in conjecture, the case may fail for want of proof. *Robinson* v. *Charles Wright & Co.*, 94 Mich. 283 (53 N. W. 938); *Redmond* v. *Lumber Co.*, 96 Mich. 545 (55 N. W. 1004). But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than the other. In this case there was no direct proof of any other probable producing cause of the explosion than such as was offered by the plaintiff. * * *

" It is true, defendant's theory and expert testimony is opposed to that offered by the plaintiff. It is the peculiar province of the jury to weigh this testimony. If the testimony offered in behalf of the plaintiff is credited, we have a case in which, on the first occasion on which an attempt was made to use this hose in the manner in which it was used, an explosion followed upon such a use of the hose as experience teaches is careless and unsafe. Under such circumstances, we think the question of what was the cause of this injury was one for the jury. Negligence, like any other fact, may be inferred from circumstances. *Alpern* v. *Churchill*, 53 Mich. 613 (19 N. W. 549); *Barnowsky* v. *Helson*, 89 Mich. 523 (50 N. W. 989, 15 L. R. A. 33). And though the proof of plaintiff depended upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury. *Crosby* v. *Railway Co.*, 58 Mich. 458 (25 N. W.

463); *Hagan* v. *Railroad Co.*, 86 Mich. 615 (49 N. W. 509); *Woods* v. *Railway Co.*, 108 Mich. 396 (66 N. W. 328)."

This vessel was built in 1862. She leaked so badly the year before the accident that the person in charge of her, rather than do the work daily required to keep her afloat, allowed her to fill with water until she settled to the bottom. When the water was taken out of her in the spring, less than $100 worth of repairs were put upon her. She was not in commission during the summer, but set light in the water, exposed to sun and wind. Upon her first voyage, when, according to the claim of the defendant, she was only two-thirds loaded, in smooth water and a comparatively light wind, she sank. Counsel are unable to say why she sank. In response to the question, "Do you know of any reason for that vessel sinking, captain?" Capt. Smith answered, "I do not; no, sir." Again he answered, "The Monitor sank without apparent cause." At another time in his testimony he called the sinking of the ship a dispensation of God. We cannot say, therefore, that there was no testimony upon which the learned circuit judge could base his opinion that this vessel sank because she was unseaworthy. Having reached this opinion, a discussion of the other questions is unnecessary.

Judgment is affirmed.

Hooker, C. J., and Montgomery, J., concurred with Moore, J.

Grant, J., concurred in the result.

Long, J., did not sit.