CROZE *v.* ST. MARY'S CANAL MINERAL LAND CO.

1. CHATTEL MORTGAGES — FORECLOSURE — SALE — LIABILITY OF MORTGAGEE—EXCESSIVE SALE.

Defendant having seized plaintiff's logs on a chattel mortgage and sold them in two lots for $7,713.43, the debt and expenses amounting to $7,051.71 in addition to services of the value of $700 to $800, an instruction holding it liable as for an excessive sale was erroneous, liability in such a case extending only to the surplus, if any, left after the debt and expenses are paid; the mortgagee not being required to sell the logs one by one until enough is realized to pay the debt and expenses, but being entitled to sell in quantity. MOORE, J., dissenting, on the ground that upon the case made by the record the instructions as a whole were sufficiently favorable to defendant.

2. SAME—NEGLIGENCE OF MORTGAGEE.

In an action against the mortgagee of logs for negligence in caring for them after taking possession for the purpose of foreclosure, defendant is entitled to an instruction that it is not liable to plaintiff for its acts with respect to certain logs belonging to third persons which appear to have been intermingled with the mortgaged logs. MOORE, J., dissenting, on the ground that upon the case made by the record the instructions as a whole were sufficiently favorable to defendant.

3. SAME—DAMAGES—EVIDENCE.

Where logs covered by a chattel mortgage were commingled by the owner with others not so covered, belonging to a third person, the mortgagor *held* not entitled to an instruction authorizing the recovery of damages against the mortgagee taking possession of the entire quantity for the purpose of foreclosure and negligently losing a part of them in transporting them to the place of sale, without showing what proportion of the logs so lost belonged to the several owners. MOORE, J., dissenting, on the ground that upon the case made by the record the instructions as a whole were sufficiently favorable to defendant.

4. PLEADING — DECLARATION — AMENDMENT — PROPRIETY — NEW CAUSE OF ACTION.

A declaration in trover for the conversion of logs seized by

defendant on a chattel mortgage and wrongfully removed from the place where seized, setting out certain negligent acts in transporting and caring for them, may be amended by adding a count claiming damages for the negligent acts described in the original declaration. GRANT, C. J., and HOOKER, J., dissenting.

5. CHATTEL MORTGAGES — FORECLOSURE — SALE — LIABILITY OF MORTGAGEE.

Where, in an action against a chattel mortgagee of logs for damages arising from foreclosure, there is testimony tending to support plaintiff's claim that after the debt and all reasonable expenses were satisfied there was a balance left, and that a large quantity of the logs were lost by defendant's negligence in transporting them to market, the court did not err in refusing to direct a verdict for defendant.

6. SAME—NEGLIGENCE OF MORTGAGEE — EVIDENCE — SUFFICIENCY.

In an action against a chattel mortgagee of logs for negligence in keeping and transporting them to market after seizure for the purpose of foreclosing, evidence examined, and *held*, that whether there was any loss of logs, and whether such loss was caused by the negligence of defendant in storing them in unsafe booms, and in attempting to tow them to market at a time of year when it was unsafe, were questions for the jury. GRANT, C. J., dissenting.

7. EVIDENCE—TESTIMONY AT FORMER TRIAL—ADMISSIBILITY—ABSENT WITNESS.

Where a witness was beyond the jurisdiction of the court, his testimony taken at a former trial of the case was properly admitted.

8. TRIAL—INSTRUCTIONS—CONSIDERATION AS WHOLE.

An excerpt from the charge should not be isolated from what preceded and followed it for the purpose of finding error.

Error to Houghton; Streeter, J. Submitted June 11, 1907. (Docket No. 26.) Decided July 1, 1908.

Trover by Joseph Croze against the St. Mary's Canal Mineral Land Company. There was judgment for plaintiff, and defendant brings error. Reversed.

*Chadbourne & Rees*, for appellant.

*Tarsney & Fitzpatrick*, for appellee.

GRANT, C. J.   A sufficient statement of the facts in this case is found in the opinion of this court (143 Mich. 514) reversing the judgment and remanding it for a new trial.

The original declaration, as stated in that opinion, contained two counts, one being the ordinary count in trover, the other a special count in trover alleging that the defendant wrongfully converted the timber to its own use by unlawfully and wrongfully removing it from the places where seized.   This part of the declaration is as follows:

" And the plaintiff avers that the said Will C. Baudin did not pay to the said defendant said sum of $4,480 and interest thereon at seven per cent. per annum, as in said mortgage agreed and that thereafter and on to wit, the first day of September, 1901, the said defendant by its agents and servants seized and took possession of the entire quantity of logs and timber aforesaid belonging to said Will C. Baudin, including the 1,000,000 feet thereof aforesaid, which was owned by the said Baudin and not included in the terms and provisions of said chattel mortgage or affected thereby, and also seized and took possession of said 1,000,000 feet referred to in said chattel mortgage as having been sold to the Tamarack Mining Company. And the plaintiff avers that the said defendant did not then and there or at any time thereafter sell that portion thereof which was mortgaged to said defendant, at public auction after a like notice as is required by law for constable's sale nor did it exercise its option to sell the same at private sale without notice, as in said mortgage agreed, but unlawfully and wrongfully removed or caused to be removed a greater portion thereof, to wit, 2,500,000 feet of said hemlock logs, and to wit, 30,000 feet of said white pine logs, and to wit, 60,000 lineal feet of flat hemlock timber from the place and places where the said logs were seized and taken by said defendant and wrongfully and unlawfully converted the same to the use of the said defendant."

The special count also alleges a damage to the timber left upon the shore at Misery Bay by reason of its "becoming sap rotten, sap stained, wormeaten and discolored,"

and that such injury was due to the carelessness, negligence, and wrongful conduct of the defendant in not caring for and protecting said logs. Aside from the allegations of damage to the logs left upon the bank at Misery Bay, the declaration was based entirely upon a conversion of the property by moving it from the places where seized and neglecting to sell the same according to the provisions of the mortgage to satisfy the debt. Upon the second trial no claim was made for damages to the logs left at Misery Bay.

We held in the former opinion that there was no conversion. There was not even a hint in the original declaration of liability for negligence in rafting and towing the logs from Misery Bay to Portage Lake, or in their care in Portage Lake. In fact most of the logs were already in Portage Lake, having been towed there during the season in several rafts by plaintiff's assignor, Baudin. After the former decision plaintiff asked and obtained leave to amend his declaration charging the defendant with negligence in towing the logs and in their care while in Portage Lake, alleging that the boom in Portage Lake broke on two or three occasions by which logs were lost, and that the breaking was due to the negligence of the defendant.

Since writing the above this court has decided *Jones* v. *Pendleton*, 151 Mich. 442. The original declaration in that case counted on a promise made by the defendant to pay plaintiff a commission on the sale of real estate. The plaintiff did not make the sale, but the sale was made through the intervention of another party. It was held that, although there was testimony tending to show that defendant told plaintiff that he should have his commission, though another party should effect the sale, he could not recover. *Jones* v. *Pendleton*, 134 Mich. 460.

Plaintiff then amended his declaration so as to include the promise that he should have the same commission though another party effected the sale. It is stated in the prevailing opinion in that case:

"The plaintiff has but one cause of action. He failed to properly describe it. The question is, whether the court has power to permit plaintiff to amend his declaration so that he may recover on the precise cause of action for which he brought suit, but which he failed to properly describe in his declaration."

That is not the situation in this case. Here the plaintiff deliberately in his original declaration set forth his right of action to be a conversion of the timber by violating the terms of a chattel mortgage. No other cause of action is even hinted at, except as to some logs left at Misery Bay. It contains no hint of negligence in towing or booming or care.

In *Jones* v. *Pendleton* a commission was the sole cause of action. The plaintiff improperly described it. In this case the original and amended declarations described two absolutely independent causes of action, bearing no relation whatever to each other. The original says that defendant took and converted plaintiff's property because he had not complied with the terms of the chattel mortgage under which defendant seized it. The amended declaration says that defendant was negligent in handling and caring for the property after it had lawfully acquired possession. I think the case is clearly distinguishable from that of *Jones* v. *Pendleton*, and that this amendment was not permissible under the statute or any decisions of this court. I do not think that an action of trover for the conversion of property can, under the statute of amendments, be transformed into an action of negligence in the care of it. In the former case plaintiff is entitled to recover the value of the entire property, and in the latter only what damage has been done to the property.

It is not sufficient that the parties be the same. They are always the same in cases of amendment. It is not sufficient that the property be the same. Usually the property is the same. In this case the property is not the same. In the trover case the declaration asserts that defendant converted to its own use the entire of the property.

In the second case plaintiff asserts there was no conversion, but that the defendant lost a part of the property through its negligence, and for that part only must it pay damages, and that upon a cause of action to which no reference is made in the original declaration.

2. I think there was no evidence of any negligence in booming the logs in Portage Lake, a narrow, land-locked harbor. It was a safe and proper place. Baudin and plaintiff had booms of some of these same logs there, which broke up before they were changed into the booms of the defendant. Their own witness testified:

"I think there were two batches of logs down there in Portage Lake, one somewhere near the Union Brewery on this side, and the other somewhere near the Hancock Pump House, a little above Griff's mill. They were left there until, I think, they broke up, some time in November. I didn't intend to disturb them at all, but they broke up, and I suggested that we bring them all down here and put them near the Isle Royale mill. Those rafts that were here in Portage Lake were in the condition in which they were found up to the time they broke up. We didn't disturb them at all. We didn't open one of them. They were not combined with the lot we brought down at the time. The first I knew about their breaking up was, I guess, from Mr. Nichols or somebody. I suggested to Mr. Goodell and Mr. Parnall that we take them and tow them down below the bridge and put them all in one lot, and lay them in back of Isle Royale there, somewhere, for the winter. I think we picked the logs up twice. We picked them up that fall. I superintended that work and ordered it done."

Several rafts—six in number according to plaintiff's own testimony—had been towed from Misery Bay to Portage Lake by plaintiff, who was employed by Baudin, and there tied up. There is no claim that they were not stored in a safe place, or that the boom was not properly constructed. The evidence of plaintiff is that it was one of the best booms in use. Plaintiff's own witness (Moore) testified that they were the best booms on the lake with the exception of the Nestor estate lake booms. There is

no evidence that the booms used by the defendant were not sound, properly constructed and such as were in common use. The only evidence that is or can be relied upon to show negligence is the fact that the booms broke perhaps on three occasions. It is urged that this breakage was so frequent as to justify the inference that it was an improper boom. Two of plaintiff's booms towed by his own tugs from Misery Bay were fastened to the shore above the Portage Lake bridge. Both these broke loose in November, and the logs so far as possible were picked up by the defendant as soon as the breaking was discovered. Would this have been sufficient to justify the jury in finding that plaintiff's booms were in bad condition or improperly constructed ? In determining this question we must refer quite fully to the testimony. One Vaudrin testified that late in the fall of 1901 he saw a raft break loose and saw a gang of men at the bridge picking up logs. There is no testimony to show whether these logs came from one of plaintiff's booms which had broken up, or from one of the defendant's booms. This same witness testified that at some time—he did not say when —he saw a number of logs around Portage Lake; that some farmers hauled them up and sawed them up for wood, but he does not give any idea as to the number. Whether these came from the booms of plaintiff or of defendant there is not a scintilla of evidence to show. Plaintiff testified that defendant took out his boom and put in its own; that the logs broke loose two or three times during that fall and the next spring. But plaintiff does not testify that these logs that broke loose in the fall did not come from his own booms which were tied to the shore of Portage Lake as above stated, and which it is conceded did break loose some time in November. It appears that plaintiff brought replevin for at least parts of his own booms.

The only reliable testimony is that of plaintiff's witness Moore. This witness testified that after the logs were

stored along the shore between Snow Shoe Island and the Clubhouse—

"Nothing happened to the logs until next spring. There was a chain let loose in the spring. I got Mr. Croze's tugs—one or two of them—and surrounded them. I happened to see them going away, and happened to be lucky to get one of Mr. Croze's tugs, and ran a boom around them and surrounded them. That was in the spring of 1902. Nothing happened to the logs during the winter and up to the opening of navigation. There was no loss during that period. We didn't lose any logs in towing them down there from where they were first put. There may have been a stray log lost out, but nothing more than what would be usual in towing hemlock logs.

"In the spring of 1902 the logs were taken out and sorted. There was no loss of logs during that time up to the time they were sorted. * * *

"After the logs were sorted, the Tamarack logs were taken up to Dollar Bay; the Canal Company's logs were taken in back of Snow Shoe Island, between Snow Shoe Island and the shore. That is a protected place. I don't think in the towing and sorting, in taking them to the place for sorting and putting back, there was any loss of logs or timber, any more than what is usual. A log will slip out of the boom, or logs will crawl out between and over the boom chains occasionally. * * * They broke up again. I ain't sure but we did finally tow them up through Portage Lake again for the Canal Company. They had been moved from behind Snow Shoe Island before they broke up. * * *

"When they broke up they laid up here by the Copper Range Railroad landing. When the boom broke they notified me, and I got a tug and men there again to pick them up. The work of picking them up was done quite thoroughly. I think they got all. There might have been a stray log got away from us somewhere. We left them there in the boom again, and I think they broke again. I helped pick them up again, and we picked up until we were satisfied that we got them all, and they were put back in the boom again."

On cross-examination he testified:

"The booms broke some, a matter of two or three times, I guess. We picked up everything as far as we could."

It appears from the plaintiff's evidence that the breaking of rafts is not uncommon. Plaintiff's assignor, Baudin, testified that two of his rafts from Misery Bay to Portage Lake "broke up" and the logs went mainly upon the shore. It is admitted that a percentage of logs is lost out of every raft, even in smooth weather. Out of the 4,600 logs above mentioned, called the beach logs, plaintiff's own evidence shows that at least 25 per cent. of them were logs belonging to other parties and which had escaped from booms being rafted over the lake.

Under these circumstances we do not think the law justifies the conclusion that the defendant was guilty of using insufficient or improperly constructed booms. Whether boats passing up and down accidentally ran into the boom, whether some unexpected pressure by storm or otherwise had been brought to bear upon it, or whether some evil-disposed persons had broken it, no one can tell or attempts to tell. Defendant put in no testimony, and the case is determinable upon the plaintiff's own evidence.

This boom lay in the waters of Portage Lake and was at any time subject to the examination of the plaintiff or anyone in his behalf. Its age and construction could easily have been ascertained. I cannot conceive of a more appropriate case for the application of the well-established rule that an accident of itself is no proof of negligence. The mere fact that the boom broke is not, in my opinion, evidence of negligence, any more than was the fact that a timber broke in the case of *Quincy Mining Co.* v. *Kitts*, 42 Mich. 34; or that a boiler front fell, as in *Toomey* v. *Steel Works*, 89 Mich. 249; or that a piece of machinery gave way, as in *Robinson* v. *Wright & Co.*, 94 Mich. 283.

Both the defendant and the Tamarack Mining Company (the latter owning a large proportion of the timber) were as interested in properly securing and caring for it as was either the plaintiff or his assignor, Baudin, who was pecuniarily irresponsible. Their own large interests

would prompt them to proper care and diligence. There must be some tangible evidence of wrong, but there is nothing, except the bare fact that on two or three occasions the boom broke, to indicate any wrong.

3. The case was submitted to the jury upon another theory, viz., that the defendant had sold more of the mortgaged logs than was sufficient to pay the mortgage debt. Upon this point the court instructed the jury:

"If you find that the defendant company could have sold just enough to satisfy the amount of the mortgage and reasonable expenses, and that it did sell more than enough, then you could render a verdict in favor of the plaintiff for the value of the property which you have found was sold in excess of the necessary amount."

The mortgage authorized a public or private sale. The first sale made amounted to $5,300. I find no complaint made as to the price obtained at this sale, or the second sale. There was then due on the mortgage $4,950.40, Baudin having paid nothing. There had been paid for liens $983.02; sheriff's fees, $57.15; the expense of sorting, scaling, etc., was $257.64; rent of booms was $440. The towing bills for delivering logs after sorting were $363.50, making the amount due, $7,051.71. These items did not include the cost of towing the two rafts from Misery Bay to Portage Lake, which, according to plaintiff's own testimony, as to his charges for towing, could not be less than $700 or $800. The court instructed the jury that there was no claim that the first sale was sufficient to cover the amount due. Subsequently sales were made amounting to $2,413.43, making the total sales $7,713.43.

Under this condition of affairs, I think it was error to submit to the jury the question whether the defendant had sold more logs than it was entitled to sell under its mortgage. I think the court should have instructed the jury that the defendant sold the logs in accordance with the terms of the mortgage and was not liable for the value of any timber in excess thereof. If, after deducting from the amount of the sales all these legitimate expenses, to-

gether with the mortgage debt and interest, any surplus
was left, defendant was responsible only for such surplus.
It was very small in any event, and it is doubtful if there
was any.   The law does not require that the defendant
should have sold these logs one by one until it had realized
enough to satisfy the mortgage.   Such requirement would
be impracticable and unreasonable.   It was authorized to
sell them in quantities, and so long as it acted reasonably
and in good faith it was liable only for the surplus left in
its   hands.    *Stromberg* v. *Lindberg,* 25 Minn. 513;
*Johnston & Son* v. *Robuck,* 104 Iowa, 523.   I find no
evidence of bad faith or unreasonableness in the sales
which defendant made.

4. The court was requested to instruct the jury that:

" From the testimony of Baudin, plaintiff's assignor, it
appears that 4,600 logs, mentioned as having been left
over from the year 1900, and which became a part of the
mass of logs in 1901, being mingled with the new cut,
were at the time of the alleged wrongs the property of the
Tamarack Mining Company.   They must, therefore, be
eliminated from this case."

If these logs belonged to the Tamarack Mining Com-
pany, the defendant is not responsible either to plaintiff or
his assignor therefor.   The court instructed the jury that
the million feet of logs covered by the Tamarack contract
must be deducted from the total number taken, and for
which the defendant would be liable.   According to
Baudin's testimony, these 4,600 logs appear to have been
as much the property of the Tamarack Mining Company
as were the million feet specified in the Tamarack con-
tract.   Baudin upon this point testified as follows:

" The cut of the previous year was all sold to the Tam-
arack, and these 4,600 logs was a part of the contract of
the year before.   I was to get out another million feet the
next year.   These 4,600 logs had been sold to the Tama-
rack before this time, I think.   I made the same kind of
a contract that I had the second year.   That was the ame
kind of a contract.   I had a contract of four million feet
the first year, and the next year another additional mil-

lion, and these 4,600 logs that I had then were a part of the first year's contract that I did not deliver. The first year's contract took the entire cut. It took everything that year, and the second year's contract they only wanted the long timber. I had a different contract the first year. I have got it somewhere in my papers,—I haven't got it here."

Under this evidence, it is at least doubtful whether Baudin had any interest in these logs. (See opinion on rehearing, 143 Mich. 521.) We refer to this as the question may arise on a new trial.

5. The only other ground of negligence upon which the plaintiff could recover was for towing the logs at an improper season of the year when storms were liable to arise. The first raft, containing about 600,000 feet, was towed in safety, the weather being good. The next raft, containing about a like amount, suffered some loss. The court instructed the jury that, under the evidence, there was no loss on the first raft, and that they could not allow a loss of more than 25 per cent. on the second raft. The vice of the instruction lies in the fact that there was no testimony to indicate what proportion of the lost logs belonged to the Tamarack Mining Company, for the loss of which the defendant was not liable. It cannot be presumed that the 25 per cent. loss included only the logs covered by the mortgage. As the court instructed the jury, Baudin was responsible for the intermingling, "and the logs of the Tamarack Mining Company were so intermingled with the logs covered in the mortgage that it was unreasonable to expect them to be separated or sorted at Misery Bay." It was therefore essential to tow them to Portage Lake in order to sort them. I am unable to see how there was any data by which the jury could determine how many of the plaintiff's logs were lost in that raft. They were in any event a very small part of those for which the plaintiff recovered a judgment.

When the logs were sorted in Portage Lake, the scale showed that the Tamarack Mining Company owned 779,171

feet, and that the logs covered by the mortgage amounted
to 789,358 feet.   If there was any testimony from which
the jury might infer that the logs were mingled in this
raft in the above proportion, there might be some data
from which to estimate the loss for which the defendant
was responsible.   I am not prepared to say that this
would not be proper, but as it is not argued it is unneces-
sary to determine it.

I think the judgment should be reversed and new trial
granted.

HOOKER, J.   I concur with the above on the first,
third, fourth, and fifth points.

·MOORE, J.   The first trial of this case took place in
May, 1904.   The judgment on that trial was reversed by
this court in an opinion found in 143 Mich. 514.   A refer-
ence to that opinion will aid in understanding the ques-
tions involved here.   After the reversal, counsel in the court
below was allowed to amend the declaration.   Defendant
opposed the amendment and excepted to the order per-
mitting the same.   At the close of plaintiff's testimony a
motion was made to direct a verdict in favor of defend-
ant.   This was overruled.   Defendant offered no testi-
mony.   The jury rendered a verdict in the sum of
$7,137.83.   The case is brought here by writ of error.

The first assignment of error demanding attention is,
Did the court err in permitting the amendment to the dec-
laration?   Counsel say that the additional counts added
by the amendment set forth a new and different cause of
action from that alleged in the original declaration, and
that for this reason the allowance of the declaration was
beyond the power of the court; that the original counts
alleged a conversion of the property, while the amended
declaration charges loss by reason of negligence in tow-
ing at an improper season of the year, by reason of insuf-
ficient fastenings while the logs were in Portage Lake,
and also includes the claim for damage by reason of per-

mitting a portion of the logs to remain on the banking ground. Also loss through negligence in conducting the work of rafting and booming.

An inspection of the pleadings will show that both declarations refer to the same logs, the same persons, and the same acts. We think the amendment was permissible under 1 Enc. Pl. & Prac., title "Amendments," pp. 558-564, *Pratt* v. *Montcalm Circuit Judge*, 105 Mich. 499, and *City of Detroit* v. *Wayne Circuit Judge*, 125 Mich. 634, and cases cited therein.

Error is assigned upon the admission of testimony. We think no good would come of a discussion of these assignments, indeed counsel do not lay much stress upon them. We shall content ourselves by saying we think the testimony was allowable. Error is assigned as to the argument of counsel. The statement criticised is based upon the record. It is urged that the assignment from Baudin to Croze was not broad enough to allow a recovery arising out of the negligence of the defendant. Among other things stated in the assignment is the following:

"And I do hereby sell, assign, transfer and set over unto the said Joseph Croze all my right, title, claim and interest in and to said logs and timber aforesaid."

We think this language, taken in connection with the rest of the assignment, was sufficient to give plaintiff the right to recover for loss arising from the negligence of defendant.

Did the court err in refusing to direct a verdict in favor of defendant? The record shows that defendant received from the logs and timber sold $7,613.43, while the mortgage debt was $4,480. It is the claim of plaintiff that, after all reasonable expenses are satisfied, a balance would still be due him. It is also claimed that a large quantity of the logs were lost by reason of the negligence of defendant; that no man of ordinary prudence would attempt to move the logs at the time they were moved.

There was testimony tending to support this claim. We think the judge did not err in refusing to direct a verdict.

Counsel say:

"Nowhere in the record is there a scintilla of evidence as to the cause of the breaking up of the rafts in Portage Lake. No witness testifies to having seen the actual breaking up of any boom, and there is nothing shown by the record but the bare fact, that on one, two or three occasions, from some cause unknown, the logs became scattered."

And they argue that defendant cannot be held for any loss of logs in Portage Lake. The logs which were on the bank when seized were in a safe place. They were taken from there at a time of year when, according to the record, no reasonably prudent man would undertake to move them. After they reached Portage Lake the booms around them and the logs already there broke up at least three times, according to some of the testimony. It is true the agent of defendant testified he gathered up all the logs at these times, but there was other testimony tending to show that a large quantity of logs were not recovered. It is true, too, as stated by counsel, that no one testified to what caused these booms to break, but we think it became a question for the jury whether there was any loss of logs at Portage Lake, and, if so, whether it was caused by the negligent acts of defendant. We think the following cases are in point: *Schoepper* v. *Chemical Co.*, 113 Mich. 582; *La Fernier* v. *Wrecking Co.*, 129 Mich. 596, and the cases cited therein.

Was it error to permit the plaintiff to read in evidence the testimony of Mr. Moore? This testimony upon the first trial was offered in evidence by the defendant. Upon the second trial it was read by the attorney for the plaintiff. Counsel say they had no opportunity of cross-examination and the evidence should not have been read. The witness was shown to be beyond the jurisdiction of the court. We think the testimony competent.

Error is assigned upon the giving of plaintiff's requests

to charge, the refusal to give certain of defendant's requests, and upon the general charge of the court. Many of the assignments of error in relation to the requests to charge are disposed of when we say the plaintiff made a case which it was proper to submit to the jury. Especial stress is laid upon an assignment of error growing out of the language in the general charge.

"The exact amount of logs banked and placed in the dam is not determined by the testimony. Estimates of the same have been given to you, but you will decide, if you can, from the testimony, what was the amount of logs at Misery Bay, being governed entirely by the testimony."

We quote from the brief:

" On what possible theory of the case can it be supposed that it was incumbent upon the jury to determine from the testimony the amount of logs at Misery Bay ? This amount could have no relation to the quantity of logs lost in towing. If the defendant was liable for loss in towing, the amount of that loss must be determined by itself, and under the testimony in this case the amount of logs at Misery Bay, banked and placed in the dam by Baudin, can in no manner be relevant to the question of the quantity of logs lost in towing. Equally true is it that this amount can have no relation to the quantity of logs lost in Portage Lake, if any such were lost. It can in no way relate to the amount of timber actually sold by defendant in excess of the mortgage debt, if there was any such sale. The charge as given was therefore erroneous and extremely prejudicial, as impressing upon the jury the necessity of finding this quantity, and it being so impressed upon them, their minds must have been charged with the notion that that quantity was the measure of defendant's responsibility."

Other sentences are also quoted from the charge which are objected to. We think the language quoted should not be isolated from what preceded and what followed it.

Among other things the court charged the jury :

" Had nothing been done with the property from the time it was banked the winter preceding, you would be justified in holding that the same amount still remained

upon the land, but there is positive testimony in this case that certain rafts were taken by Baudin from this mass of logs, and towed down to Portage Lake. Is there testimony in this case from which you can determine what the amount was which was so taken and conveyed from Misery Bay by the rafts? If there is, then you should consider that testimony in determining the amount which remained at Misery Bay, and which was taken possession of by the defendant. There is also testimony introduced on the part of the plaintiff as to the amount of logs which was finally left at Misery Bay, and testimony showing that the defendant took away two rafts from Misery Bay. If there is testimony in this case from which you can determine the amount which was left on the shore at Misery Bay, and the amount taken by the defendant in the two rafts, then you have a right to consider all that in determining the amount which was seized by the defendant at Misery Bay.

"In addition to that, there was a quantity seized by the defendant in Portage Lake, which amount is to be added to that taken by the defendant at Misery Bay, and these two together constitute the full amount of property for which the defendant is responsible. After the defendant had taken possession of the property at Misery Bay and in Portage Lake, it joined with the Tamarack Mining Company in appointing an agent to look after the interests of the two companies. The Tamarack Mining Company in its contract with Baudin was entitled to take possession of a million feet and to bring them down to Portage Lake and deliver them at Dollar Bay. The logs of the Tamarack Mining Company were so intermingled with the logs covered by the mortgage that it was unreasonable to expect them to be separated or sorted at Misery Bay.

"Acting for the two companies, their agent, Mr. Moore, took possession of the entire mass of logs; thereupon the title to the so-called Tamarack logs passed to the Tamarack Mining Company.

"Under all the testimony in this case, you will have to determine whether it was negligence for the defendant to tow or attempt to tow the logs in controversy from Misery Bay in September and October, 1901, and if you find the defendant was negligent, then it is liable to the plaintiff for such loss and damage as is shown by the evidence in this case to have resulted from the towing. The testi-

mony in the case is undisputed that the time of year was not a safe time for towing on Lake Superior, but in determining the question as to the negligence of the defendant in this case, you should take into consideration all the circumstances which have appeared bearing upon that question; the fact that the man in charge was agent of the Tamarack Mining Company, the owner of a large portion of the logs, the situation of the logs on the shore of Misery Bay, and in the dam, and all other matters which have been testified to so far as they bear upon the question of the plaintiff's negligence in removing the logs at that time of the year.

"As I have said, the Tamarack Mining Company, at the time of the removal, was the owner of the logs. It had a right to handle them as it chose. They could not be separated from the Baudin logs where they were, and the condition of the logs at that time so far as the intermingling is concerned was entirely due to the acts of the plaintiff's assignor. I say all these matters should be considered by you in determining the question of the negligence of the defendant, and this should be borne in mind in considering what was done after the logs reached Portage Lake.

"The defendant in this case, having the interest of a mortgagee in the property, was obliged under the law to take such care of the property as a reasonably prudent man under like circumstances would take with regard to his own property, and the situation is not one where it appears from the testimony that the defendant company had the absolute control and right to do with the mass of logs as it chose until after the sorting was done in Portage Lake in the spring of 1902.

"It is also claimed by the plaintiff that the defendant company is responsible because it sold more logs than was necessary to satisfy the mortgage and reasonable expenses of sale. On this branch of the case a good deal was said to you about the seizure of certain logs by the defendant company, which were not included in the mortgage. You are not to consider this matter at all for this reason: All the property taken by the mortgagee was in the condition in which it was left by the mortgagor, so mixed and intermingled that it was impossible for the defendant company to distinguish and take just such a number of logs as were covered by the mortgage. The situation was created entirely by the mortgagor. He knew of the tak-

ing of possession by the defendant company very soon after that was done. He made no claim upon it for any property not covered by the mortgage, he pointed out no logs which he claimed were not covered by the mortgage. So this is a matter not for your consideration in the slightest degree.

"Now, in determining whether more logs were sold than were sufficient to cover the mortgage debt and reasonable expenses, you must take the situation of things as they were at that time. You will allow the defendant company all the expenses properly incurred by it in removing the property from Misery Bay to Portage Lake, in caring for it at Portage Lake, its expenses in the sale and delivery and such other reasonable expenses as may have appeared in the evidence in this case. You will also consider the situation of the property, nature of the property at the time the second sale was made. No claim is made in this case that the first sale made by the defendant company satisfied the mortgage. If the situation of the property remaining in the hands of the defendant company was such as to render the second sale proper in its amount, and it were such that the defendant company could not select a particular amount from the mass at fair advantage, still leaving a small residue, it had a right to sell as it did, and the recovery (should you find that this was the state of affairs) of the excess price could not be had in this action. But if you find that the situation were otherwise, and that the defendant company could have sold just enough to satisfy the amount of the mortgage and reasonable expenses, and that it did sell more than enough, then you could render a verdict in favor of the plaintiff for the value of the property which you have found was sold in excess of the necessary amount.

"Now, gentlemen, there are certain questions which you must determine positively from the testimony. The jury will determine the quantity of logs and timber put in by Baudin and banked on the shore at Misery Bay and in the slough in 1901.

"From the quantity of logs and timber so determined, the jury will deduct one million feet of logs, eighteen feet and upwards in length, which became the property of the Tamarack Mining Company, and need not be further considered in this case. The jury will determine the quantity of logs towed by Baudin in the summer of 1901

to Portage Lake, and the quantity thereof taken possession of by the defendant.

"The jury will determine the quantity of logs actually in the possession of the defendant in Portage Lake in the fall of 1901, which came from Misery Bay, including those towed by Baudin and those towed by the defendant.

"The jury will determine the quantity of logs lost by the defendant in towing from Misery Bay, and the value thereof. The jury will determine the quantity of logs lost in Portage Lake, and the value thereof. If the jury find the logs and timber were lost by reason of the negligence of the defendant, either in towing from Misery Bay or in Portage Lake, they will determine the quantity and the value thereof, and render a verdict therefor in favor of the plaintiff.

"Default having been made by Baudin in the payment of the sum secured by the chattel mortgage in evidence, the defendant was authorized to take possession of the mortgaged property and sell so much thereof as was necessary to satisfy the debt, interest and reasonable expenses, and to retain the same out of the proceeds of such sale. The overplus or residue of said property, so mortgaged, if any, belonged to, and should have been returned to, Baudin or his assignee, the plaintiff in this suit. You will determine the amount due, the interest thereon up to the time of sale, and reasonable expenses, and the quantity of logs and timber sold by the defendant for the purpose of satisfying the same, and fix and determine the quantity of logs and timber which should have been returned to Baudin and his assignee, the plaintiff, if any, and the value thereof, and return a verdict therefor in favor of the plaintiff, together with interest thereon from the time such mortgage debt was satisfied.

"The defendant, holding a chattel mortgage given by plaintiff's assignor, and there having been a breach of the condition by failure of Baudin, the assignor, to pay the indebtedness secured by the mortgage, had, under the terms of said mortgage, the absolute right to take possession of the mortgaged property, and also all other property of the same nature which had been indistinguishably intermingled with those described in the mortgage, which would by such intermingling become part of the mortgaged property.

"It appearing that there were mingled with the logs

covered by the mortgage, certain logs belonging to the Tamarack Mining Company under a contract of sale thereof made by Baudin to said Mining Company, it was the duty of the defendant to gather the property together at Portage Lake and that the Tamarack logs should be withdrawn and sorted out before the mortgaged property could be sold.

" The defendant cannot be responsible in this case for any loss or damage to any of the Tamarack logs, which logs, as described in the contract, were one million feet of hemlock logs, eighteen feet and upwards in length, and fourteen inches and upwards in diameter at the smaller end.

" Under the allegations of the declaration in this cause, the defendant cannot be held responsible for any loss of logs except such as resulted directly from some acts of negligence of the defendant in handling the same. If you find that the defendant towed a portion of the logs in question at a season of the year when it was improper to do so, and that such towing was negligent, and showed a lack of ordinary care on the part of the defendant, the defendant then would be held responsible for any loss of logs occurring through such towing and as the direct result thereof, but could not be held for any further or additional losses.

" Under the testimony in this case you must confine yourselves to the consideration of loss resulting from the towing of the second raft towed under the management of defendant's agent, Mr. Moore. Under the testimony, this raft contained a little more than six hundred thousand feet. As the law will not permit you to guess how much more, you are limited to six hundred thousand feet as the size of this raft. The testimony of Mr. Moore, plaintiff's witness, shows that there was a small proportion of this raft lost, and that the loss was less than one-fourth. And there is no other testimony in the case on the subject. Under this testimony you can find no amount of loss resulting from any negligence of the defendant exceeding one-fourth of the quantity of this raft, and such loss as you may find must be apportioned between the Tamarack logs and the logs covered by the mortgage, and only so much of the loss as consisted of the logs covered by the mortgage can be chargeable to the defendant, and your verdict must be limited to the value of that particular loss.    *    *    *

"Any damages which the plaintiff may be entitled to recover are limited to his property interest in the property alleged to have been lost. This interest could only be that remaining over and above the amount due on the mortgage, together with interest and expenses of removal, caring for and sale of the property, together with all sums paid for liens upon the logs. If you should find any loss of property for which defendant is responsible under the principles laid down to you, nevertheless the plaintiff cannot recover therefor unless such loss exceeds any balance due under the mortgage, and this only to the extent of such excess.

"It appears from the testimony in this case that a certain portion of the logs were towed in the summer of 1901 to Portage Lake by Baudin and remained under his charge and control until the time when the defendant took possession under its mortgage. It further appears from the testimony there was some loss of logs from this quantity. The amount of such loss is wholly indeterminate under the testimony and you will therefore eliminate from consideration all or any part of the logs which were towed by Baudin before the Canal Company took possession, since the defendant cannot, under the testimony in this case, be held responsible for any loss of any portion of said logs, even if loss did occur from such portion after it took possession."

We do not think there is any just cause of complaint growing out of this charge. The judgment should be affirmed.

CARPENTER, J. I agree with the Chief Justice that this case should be reversed upon the grounds 3, 4, and 5 stated in his opinion. Upon the other propositions discussed in his opinion and in the opinion of Justice Moore, I agree with Justice MOORE.

BLAIR, MONTGOMERY, OSTRANDER, and MCALVAY, JJ., concurred with CARPENTER, J.