## GLOBE S. S. CO. v. MOSS.

(Circuit Court of Appeals, Sixth Circuit. August 1, 1917.)

No. 2966.

1. SEAMEN ⬡⟿3—INJURY IN SERVICE—LAW GOVERNING LIABILITY.

A suit in admiralty by a seaman to recover for an injury alleged to have been caused by defective machinery or appliances on the ship is governed by the admiralty law.

2. SEAMEN ⬡⟿29(2)—PERSONAL INJURY—DEFECTIVE MACHINERY OR APPLIANCES.

A shipowner owes to his seamen a positive and nondelegable duty to see that the ship is seaworthy and her equipment in safe condition for use when she starts on a voyage, and a seaman, injured through failure to perform this duty, is entitled to compensation.

3. SEAMEN ⬡⟿29(2)—PERSONAL INJURIES—DEFECTIVE MACHINERY.

Libelant was assistant engineer on respondent's steamer. Soon after starting on a trip, the feed pump stopped and libelant attempted to start it, as had been done before, by forcing a piston back into the cylinder with a pinchbar; but it immediately flew back, causing the pinchbar to strike and injure libelant's head. Shortly after the injury the cylinders were opened, and the piston was found to be broken in two or three pieces. The pump had not worked well for two years, and it had frequently been necessary to start it when it stopped by external means; but during that time the cylinders had not been opened to ascertain the trouble. Held, that the evidence, while it did not show definitely the defect which caused the piston to fly back, was sufficient to support a finding by the trial court that the defect existed at the time the ship left port, rendering her unseaworthy, and that respondent was negligent in not ascertaining and remedying it, and was liable for libelant's injury.

4. SEAMEN ⬡⟿29(5)—SUIT FOR PERSONAL INJURY—EVIDENCE.

In determining the negligence of respondent in maintaining the pump in an unsafe condition, the fact and nature of the accident might properly be taken into account, in connection with all other circumstances of the case.

5. SEAMEN ⬡⟿29(4)—PERSONAL INJURY—ASSUMPTION OF RISK.

The risk of injury from the flying back of the piston, when forced into the cylinder, was not one assumed by libelant, who had a right to assume that the owner would keep the pump in a safe condition.

6. SEAMEN ⬡⟿29(4)—PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE.

In the absence of knowledge that the piston was likely to fly back, libelant was not chargeable with contributory negligence in taking a customary method of forcing it into the cylinder.

7. ADMIRALTY ⬡⟿118—REVIEW ON APPEAL—FINDINGS OF TRIAL COURT.

A finding on a question of fact by an admiralty court, which heard the witnesses, will be accepted by the appellate court, unless the evidence greatly preponderates against it.

8. SEAMEN ⬡⟿29(1)—PERSONAL INJURY—LIABILITY OF OWNER.

A shipowner, whose negligence contributed to the injury of a seaman, is liable therefor, notwithstanding the concurring negligence of another.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

In Admiralty. Suit by Henry Moss against the Globe Steamship Company, owner of the steamer Frank C. Ball. Decree for libelant, and respondent appeals. Affirmed.

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Thos. H. Garry, of Cleveland, Ohio, and Sherwin A. Hill, of Detroit, Mich., for appellant.

Frederick L. Leckie, of Cleveland, Ohio, for appellee.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. The appellee, while in the performance of his duties as assistant engineer of the ship Frank C. Ball, owned by appellant, and while on a voyage from Lorain, Ohio, to Duluth, Minn., was seriously injured in an attempt to start a defective feed pump used for supplying water to the boilers. To recover the damages suffered appellee filed libel in admiralty against the ship; the appellant giving bond to answer the decree. Upon hearing in open court, decree passed for libelant, from which this appeal is taken.

The ground on which the right to recovery is rested is that the pump was so defective as to render the ship unseaworthy as respects appellee, and to amount to a negligent failure of duty to supply and keep in order the proper appliances appurtenant to the ship—a duty analogous to the ordinary duty of a master to furnish his servant a safe place to work and safe appliances to work with.

[1, 2] The case is governed by the admiralty law. Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086; Tropical Fruit S. S. Co. v. Towle (C. C. A. 5) 222 Fed. 867, 868, 138 C. C. A. 293. The rule in admiralty is well settled that a ship owner owes to his seamen a positive and nondelegable duty to see that the ship is seaworthy and her equipment in safe condition for use when she starts on a voyage, and that a seaman injured through failure to perform this duty is entitled to compensation. The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760; Thompson Towing, etc., Ass'n v. McGregor (C. C. A. 6) 207 Fed. 209, 211, 124 C. C. A. 479, and cases cited.

[3] The feed pump, as fastened to the floor of the engine room, was about 20 feet long; it was duplex in that it had two sides which, when not in use, were independent of each other; it was compound in that each side had both a high-pressure and a low-pressure cylinder, the steam first passing through the high-pressure cylinder and then into the low-pressure; the pistons of the high and low pressure being connected to a common piston rod, which in turn connected with a crosshead on which was bolted a plunger operating in one end of the water cylinder; another crosshead (suitably connected with the first) held another plunger. In operation the plungers alternately extended forward out of the water chambers. The feed pump was started when the boat left Lorain, which was about noon; it did not work well, and finally stopped, leaving one plunger within the chamber, the other extending out the full length of the stroke, which was about 12 inches. To start the pump appellee took an iron pinchbar, 6 or 7 feet long and weighing about 25 pounds, fulcrumed its lower end against the angle iron edge of the oil pan, which was fastened to the floor and pushed against the crosshead; the plunger was thus finally forced into the cylinder, but immediately flew back, causing the pinchbar to strike

appellant upon the forehead, knocking him backward and causing his head to strike a metal pipe.

The refusal of the pump to start when the steam valves were opened, and the sticking of the plungers, were not a new experience; it had frequently occurred for two years before the accident. The chief engineer, who was a witness for appellant, testified that it usually happened three times out of ten when the ship left port. On such occasions the pump was started either by using a pinchbar in the way used by appellee as before described, or by the use of a chain fall—a chain in the nature of block and tackle—to pull out the plunger which was within the cylinder, or by a blow from a heavy iron sledge with all the force a man could muster against the nut on the end of one of the guide rods, a usage which had considerably battered up the nut. The chief engineer had taken part in all three of these methods of starting the pump. Sometimes after being so started it would stop and require restarting by the same process two or more times. There was testimony of credible witnesses that trouble in starting this kind of a pump was not unusual; but we agree with Judge Tuttle that:

"A fair interpretation of their testimony is that the troubles to which they refer are not of the kind shown to have occurred with this pump. Nearly all of them speak of pumps that require a *little force* to start them. This pump frequently stuck in a way that required a *great deal of force* to start it. It seems plain from this record that this was a poor pump, did not work well, and never was in proper working order at any time during the period covered by the testimony in this case; that is, two years preceding the accident." (Italics ours.)

None of the witnesses seem to have ever known a pump which gave so much trouble as this; to some of the witnesses for appellant the use of chain fall and sledge seems to have been unheard of, and by one or more, at least impliedly, condemned. The most prominent of the suggested causes for such sticking of the plunger were air in the suction pipe, dryness of the cylinders, too tight packing, and leaking valves. We think it a fair deduction from the testimony that the experience had with this pump was such that the difficulty could be satisfactorily accounted for by neither nor all of these causes.

We are satisfied that there was something vitally and radically wrong with the pump at the time the ship left Lorain on the voyage in question. We think this indicated by the experience up to that time, and corroborated by what developed later.

Following the accident no attempt was made to operate the feed pump, nor does it seem to have been examined until the ship arrived (about midnight) at Detroit, where it picked up the chief engineer, and, after putting off appellee at the dock and sending him in an ambulance to the Marine Hospital, the ship was anchored in the river. The chief engineer then opened up the cylinders and found the piston in the high-pressure cylinder broken in two or three pieces. If this piston was broken, or even seriously cracked, before the boat left Lorain the ship was unseaworthy. One of defendant's witnesses presents the theory that the piston was broken after leaving Lorain, but before the accident; others, that the flying back of the plunger when appellee

was hit caused the break. It is possible that the break occurred in either of the two ways suggested, but the question must be considered in the light of the evident fact that appellant has not given the court all the aid possible to be furnished. The piston was not presented in court, and seems not to have been preserved. Its production might well disclose valuable evidence on the question of its condition prior to the accident, including the evidence or lack of evidence of old cracks or breaks. The fact neither of the accident nor of the docking at Detroit was entered upon the permanent log, although it is said such record is required, and although the captain is confident he entered the facts upon the scratch log (which was lost or thrown away), and although the fact of the accident was so well in mind during the voyage that the ship was met at Duluth by its representative, who took the written statements of its seamen regarding the accident. This suppression of the record was a foolish and vain thing; but we can see no other reason for it than that suggested by the District Judge, viz.:

"So that if the owner or boat got in a lawsuit any kind of a theory could be advanced, when there was plenty of time for interested parties to think the matter over."

While, as already said, it is possible that the piston was broken by its flying back as stated, at the time of the accident, it would seem more probable that it was broken before that time. Indeed, the treatment to which the pump had been subjected for so long a time in the use not only of pinchbar and chain fall, but especially of iron sledge, would tend to injure the internal mechanism of the pump, if not the piston itself. And it seems the more reasonable conclusion, to say the least, that the application of steam would not have broken the piston, unless it were previously injured, or unless there was already some radical infirmity in the internal structure of the pump; and that it would not have failed, after 30 minutes' effort, to continue to run unless radically wrong. The suggestion that the oiler broke the piston when he started the pump on leaving Lorain seems little, if anything, more than a surmise, and is opposed to the belief of the oiler, and to his testimony that:

"She was jumping from one end to the other when I turned the steam on [and he says he "started it slow"]; then it made a sort of jump."

There is credible testimony that the pump could have run for some little time, even with the broken piston. But whether or not there was a broken piston previous to the ship's leaving Lorain (which we think the more reasonable conclusion), we are convinced that the condition of the pump at that time was so radically defective as to make reasonably probable and as to cause the accident which did happen.

Under these circumstances, an affirmative and definite showing of the precise defect which caused the plunger to fly back is not essential to liability. It is enough, as against the charge of speculation, that the conclusion that the action was due to a radical defect in the interior condition of the pump, previous to leaving Lorain, seems more reasonably probable than any other.

We agree with the conclusion of the District Judge that appellant did not use due care with respect to ascertaining and remedying the

actual defects in the pump. The experience had during the two years preceding the accident called for a thorough examination of its internal structure. During the year preceding the year of the accident a piston rod had been broken and repaired; but, aside from this, no internal examination seems to have been had, although external means were frequently taken to relieve the difficulty, never with more than temporary success, and although the machinery would naturally be overhauled during the winter preceding the accident, and although some grinding of valves had been done at Buffalo just before the trip to Lorain, during which trip the pump seems to have worked fairly well. Whether or not the chief engineer represented the ship owner in the care of the ship, and the duty, as between the ship owner and appellee, to keep the engine-room machinery in safe condition, we think, to say the least, that due care and inquiry on the part of the fleet engineer, who had general oversight of all the boats in appellant's fleet, including the overhauling at the end of the season, would have led to the discovery of the defective condition of the pump, which every one connected with its operation during the preceding two years well knew; and it is reasonable to believe that a thorough internal examination would have disclosed the existence of radical fault and thus have led to its remedy.

[4] In reaching the conclusion that appellant was negligent in maintaining the pump in unsafe condition we may properly take into account the fact and nature of the accident, in connection with all the other circumstances in the case, notwithstanding negligence is not ordinarily assumed from the mere fact of accident. La Fernier v. Soo River Co., 129 Mich. 596, 89 N. W. 353; Byers v. Carnegie Steel. Co. (C. C. A. 6) 159 Fed. 347, 351, et seq., 86 C. C. A. 347, 16 L. R. A. (N. S.) 214.

[5] In our opinion, appellant has not sustained the burden of showing that appellee assumed the risk of starting the pump. The risk of what actually happened was not assumed merely by accepting and continuing the employment. It is not enough that appellee knew the pump was defective. The plunger had never before been known to fly back; and we cannot say that appellee had reason to expect it would do so. The actual risk was thus not appreciated nor consciously assumed. C., N. O. & T. P. Ry. v. Thompson (C. C. A. 6) 236 Fed. 1, 10, et seq., 149 C. C. A. 211, and cases cited. Appellee had the right to assume, in the absence of notice to the contrary, that the ship owner would make due inspection of the pump and keep it in safe condition. C., O. & G. Ry. v. McDade, 191 U. S. 64, 67, 24 Sup. Ct. 24, 48 L. Ed. 96; C. & O. Ry. v. Proffitt, 241 U. S. 462, 468, 36 Sup. Ct. 620, 60 L. Ed. 1102. He had no right to undertake this duty himself; to have done so would probably have cost him his job.

Nor did he assume the risk by starting on the voyage from Lorain. The chief engineer had, without the knowledge of the ship owner, left the ship at Lorain, and gone to Detroit by rail, leaving the engine room in charge of appellee, whose license papers were insufficient for a ship of the size of the Ball. As a practical proposition, he had to take charge of the engine and its appurtenant machinery. It is immaterial.

to the question of assumption of risk that this undermanning of the ship was without the owner's knowledge.

Nor did the appellee assume the risk by starting the feed pump, instead of using either the injectors or the service pump. The injectors were used only in harbors, and not when the ship was at sea; the service pump was devoted to a variety of uses, including fire service, and was auxiliary only to the feed pump with respect to supplying the boilers. Moreover, the feed pump supplied hot water to the boilers, while the service pump gave only cold water; the accident occurred in December. The defect in the feed pump was discovered while at sea. Under all these circumstances, due observance of duty demanded that appellee try to start the pump, as had always been done under and by the direction of the chief engineer. The case does not fall within the general rule invoked by appellant, that an employé engaged in repair work assumes the risks necessarily incident thereto. No repair of the pump was being had or attempted; nothing that appellee did or could do would repair the defects; he was only trying to start the pump, and his employment at the time was no more in the nature of repair than would be the throwing of an engine off the center. It is also urged that appellee was guilty of contributory negligence, and so could not recover full compensation.

[6] We assume, for the purposes of this opinion, that there is in admiralty a defense of contributory negligence analogous in principle to that prevailing in common law actions. It is surely no more favorable to a shipowner than to an ordinary employer.

The burden of proof is upon appellant, and again we are satisfied that the burden has not been sustained. In the absence of knowledge that the plunger was likely to fly back, appellee was not negligent in standing in front of the pump and pushing upon the bar, instead of pulling from behind. He took the course always followed on the ship, and which enabled greater purchase than did the other way.

[7, 8] But there was testimony of several witnesses that the plunger could not fly back unless live steam was turned on or unless the bleeders (through which the water of condensation is discharged) were closed; and it is assumed that appellee either turned on the steam or closed the bleeders, or both. But this contention is not sustained by the testimony. Appellee testified that he had already tried unsuccessfully to keep the pump going by turning on the steam after using the pinchbar, and that the steam was turned off when the bar was used the previous time. This is undisputed. There is no testimony that he closed the bleeders, except that of the oiler, and he had previously given a written statement that the bleeders were not closed. The District Judge, who heard his testimony in connection with the other testimony in the case, refused to believe it, and refused to believe that appellee either turned on the steam, or knew it was turned on, or failed to open the bleeders, or after they had been opened closed them. The evidence does not preponderate against this conclusion, and we accept it as correct. City of Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157; Monongahela, etc., Co. v. Hurst (C. C. A. 6) 200 Fed. 711, 119 C. C. A. 127; Pugh v. Snodgrass (C. C. A. 6) 209

Fed. 325, 126 C. C. A. 251; Erie, etc., Co. v. Dunseith (C. C. A. 6) 239 Fed. 814, 816, —— C. C. A. ——. Assuming what the District Judge says was plain to him, that "the steam must have been on, or the valves were defective in such a way that the steam rushed in, or that being shut off it was turned on," it does not follow that appellee turned on the steam. When the accident occurred he was at the water end of the pump, about 14 or 15 feet from the steam valve. If the steam was turned on, it is fully as likely that the oiler did it, and if the negligence of the ship owner, in failing to keep the pump safe and seaworthy, contributed to the injury, the shipowner is liable, notwithstanding the concurring negligence of the oiler. See by analogy Kreigh v. Westinghouse Co., 214 U. S. 249, 257, 29 Sup. Ct. 619, 53 L. Ed. 984 and cases cited; American Shipbuilding Co. v. Lorenski (C. C. A. 6) 204 Fed. 39, 44, 122 C. C. A. 353; Meers v. Childers (C. C. A. 6) 228 Fed. 640, 643, 143 C. C. A. 162.

Whether or not appellant was at fault in not taking appellee back to Lorain for earlier treatment, instead of going through to Detroit (The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955), we need not consider, for the reason, if for no other, that the damages awarded were agreed upon by both sides as full compensatory damages; and there is nothing to indicate that the element of delay entered into the ascertainment of the amount of damages.

It results from these views that appellee was entitled to full compensation, and was not limited to relief by way of maintenance and cure, as for mere negligence in operation of the ship.

The decree of the District Court is affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes