## IGNETTI v. JOSEPH INTALL & CO. et al.

### (District Court, E. D. New York. July 8, 1922.)

1. **Master and servant ⊜⇒278(3)—Shipping ⊜⇒86(2)—Stevedore's injuries held due to negligent failure to provide safe place and appliances for work.**

On libel for injuries to a stevedore, received while loading a vessel, evidence *held* to show that the injury was not due to the negligent method of work adopted by fellow employés, but was due·to defective appliances furnished for the particular method of work by the vessel, and the employing stevedore's negligence in having the men work in a place of danger, without posting a watchman to warn them.

2. **Damages ⊜⇒132(8)—Stevedore awarded $2,500 damages for injuries to chest and arm.**

Injuries to the chest and arm of a stevedore, resulting in a broken rib and perhaps a broken shoulder blade, which caused severe pain and total incapacity for several weeks, after which he was unable to resume heavy labor, *held* to entitle him to $2,500 damages, in view of evidence that part of his subsequent inability to labor was due to causes other than the injuries.

In Admiralty. Libel by Gabriel Ignetti against Joseph Intall & Co., the Caribbean Shipping Company, Limited, and the United States. Decree rendered for libelant against the respondents, other than the United States.

Thomas O'Rourke Gallagher, of New York City, for libelant.

William Butler, of New York City, for respondent Intall & Co.

James A. Hatch, of New York City, for respondent Caribbean Shipping Co., Limited.

Wallace E. J. Collins, U. S. Atty., of Jamaica, N. Y.

CHATFIELD, District Judge. On the 27th day of January, 1921, the libelant was one of a gang of stevedores stowing cargo in the No. 3 hatch of the steamer Lake Markham, a Shipping Board boat operated by the Caribbean Steamship Company under contract. Various stores or small cargo had been lowered into the No. 4 hatch from the pier during the forenoon, and, just before the accident to the libelant, crated automobiles had been loaded from a lighter alongside by means of the port booms, into the No. 3 and No. 4 hatches. The cargo had reached a point where but one or two more drafts could be stowed under the deck, and the heads of the stevedores, standing in the hatchway upon the cargo, were above the edge of the coaming.

Some delay seems to have occurred for a few moments while a draft of iron sewer pipe, consisting of 14 or 15 pipe lengths, each 7 or 8 feet long, was raised from the lighter by means of the boom of the No. 4 hatch, operating with a steam hoist. The tackle from the port boom of the No. 3 hatch was attached to this draft, and the load was then swung over to be lowered into the No. 3 hold by means of the engine hoist of the No. 3 hatch. For this purpose both guys of the No. 3 port boom were securely fastened by double blocks. These guys passed through double blocks, making four parts to each tackle,

and the end of the guy was wrapped around two niggerheads or bitts upon the deck. The boom of the No. 4 hatch was left so that it could swing over the side next the lighter, when the opposite guy rope was paid out by a stevedore, who released the guy from the niggerheads and let it run through· the· sheaves of the pulley block, as the strain drew the No. 4 boom around. He also was supposed to take up the slack as the boom came back. It appears that members of the stevedoring gang were working the hoist, had rigged the tackle, made the connections between the No. 3 and No. 4 booms for this purpose, and attended to giving signals when the draft was being lowered.

After the short delay which has been spoken of, the draft of sewer pipe, suspended from the No. 4 boom, was swung over toward the No. 3 hatch by the pull of the No. 3 hoist, when the guy rope from the No. 4 boom, which was comparatively new rope and evidently in good condition, became kinked and failed to run through the block. The stevedore paying out this line was unable to straighten out the kink, the hoister of the No. 3 boom caused undue strain upon the rope, which parted, and the draft, swinging violently, caught the libelant in the left side of his chest, just as he looked up at a warning shout from the signalman. Other members of the gang, at the warning, succeeded in getting out of the way.

The libelant suffered a fracture of at least one rib, and some injury, with a possible crack, in his scapula or shoulder blade on the left side. He had hemorrhages from the lungs, suffering considerable pain, and was laid up in the hospital and at home for some four or five weeks before he could get around, in the meantime having a cast and bandages around his left side and shoulder. He suffered considerable pain, and finally began to walk around as a relief from lying in bed. He has done no work, except recently, to help certain push-cart peddlers and within the last few weeks to operate a push cart himself, having obtained a license therefor. It is apparent that he is unable to use his left arm and hand as freely as before the accident. He complains of intense pain constantly up to the present time. He is unable to raise his arm above a horizontal position out from the shoulder, and resists efforts to force his arm up, although manipulation of the arm by the physicians indicates that this condition is partly imaginary, and may be due to other causes than any physical injury still remaining from the accident. He was earning amounts varying from $40 to $75 a week, according to the steadiness of his work. He had never been sick or injured previously, and was apparently an industrious, capable man.

[1] It is apparent that the guy rope was broken, and that the draft swung against the libelant, because of the undue strain placed upon the guy rope through the pull of the winch upon the wire cable hoisting the load, when the guy rope became kinked. Certainly no fault or charge of negligence can be made against the stevedore, who was handling the line which became kinked. It apparently was an accident due to the condition of the rope, and the evidence shows no personal carelessness in the way in which the stevedore paid out this particular rope.

In the same way, the evidence shows no carelessness on the part of the winchman, who was running the winch rapidly, but not at such a rate as to make the accident attributable to that cause. Although the winch might be so operated as to bring the full strength of the engine against the cable or some part of the apparatus, through the failure to observe the movements of the corresponding apparatus belonging to the winch of the other hatchway, there is nothing in this case to point to any such cause for the accident. The fault seems to have been that of the employer stevedore in allowing these men to stand in such a dangerous position in the hatchway, without having some one on watch to warn them in case of danger, or in the failure on the part of the foreman of the stevedores to see that the rope used for the guy in question was suitable.

It would appear from the testimony that the rope was new and kinked easily. It evidently was not in poor condition in the ordinary sense, but just as evidently was not suitable for the purpose intended. The libelant was not thus given a safe place to work, nor was he protected by the use of safe appliances, and for this the employer was responsible, rather than the libelant's fellow workmen. Nor did the steamship company turn over to the stevedores a suitable rope for the purpose intended.

[2] There was considerable dispute upon the trial as to the extent of the libelant's injuries. His age, general bodily condition, and ordinary physical troubles attributable to other things than the accident, enter largely into his present inability to work.

An award of $2,500 will be decreed against the stevedore and the Caribbean Shipping Company, Limited. The libel against the United States must be dismissed.