3 F.2d 476 (1925)
THE WACO.
BROCKLEHURST
v.
UNITED STATES.
No. 153.
District Court, E. D. Pennsylvania.
January 30, 1925.
*477 Carl G. Kirsch, of Philadelphia, Pa., for libelant.
Howard H. Yocum, of Philadelphia, Pa., for the United States.
THOMPSON, District Judge.
This suit was brought by Joseph M. Brocklehurst, a seaman rated as water tender upon the steamship Waco, to recover damages for personal injuries received by him in attending to his duties while engaged in putting in place a boiler cover, which slipped and fell, striking and injuring the libelant's foot. The libelant had signed upon the Waco as a water tender about one week prior to his injury. The Waco was lying at her dock at Philadelphia. He was instructed by the second assistant engineer to replace the port cover upon the port boiler. As water tender, he was a petty officer, and had two men under him, assisting in the work.
The Waco was equipped with Babcock and Wilcox marine steam boilers. The sets of tubes comprising the boiler in question are placed so that the tubes slant downward from the rear or aft end. In order to gain access to the tubes for the purpose of inspection and cleaning, they are provided with a detachable cover at the rear end, placed at right angles to their direction. The cover is rectangular, made up of two sheet iron plates riveted together, the outer plate being one-eighth inch and the inner about one-sixteenth inch in thickness. The purpose of the inner or baffle plate is to protect the outer plate from the high temperature of the boiler and prevent warping or deterioration. The cover is 73 inches in height by 41 inches in width, and weighs about 170 pounds. Owing to the inclination of the boiler, when the cover is in place, it rests at an angle leaning from its bottom toward the front of the boiler at its top.
The cover is stiffened on the inside of the baffle plate with straps of one-quarter inch metal, bent at right angles inward at the lower edge of the plate, so as to rest upon a metal frame extending around the after end of the boiler. The cover is held in place by dogs, three across the bottom, three across the top, and four down each side. These dogs consist of screw bolts, provided with pawls on the inner end and handles on the outer end, the handles being square with the pawls, so that, when turned, they attach and hold the cover tightly against the frame. When the dogs are in place, they are held in position by butterfly nuts, which, when screwed down tight, fasten them securely.
Immediately aft of the boilers is the engine room bulkhead, which is strengthened by stiffeners, 12 inches in depth. The distance from the stiffeners to the bottom of the cover, when in place, is 16 inches, and to the top of the cover 36 inches; 28½ inches below the base of the cover when in place, and above the tank of the boiler, is erected athwartship a staging or platform extending the length of the width of the boiler. It is 15 inches in width.
The libelant on the day in question, under the orders of the second engineer, and being as petty officer in charge of the work, assisted by two men, was engaged in replacing the cover, which he with two other men had removed on the morning of the same day. While so engaged, standing upon the staging, he hooked the three dogs on the bottom of the cover. One of his assistants was on the top of the boiler, and was attempting to fasten the dogs at the top, when the plate slipped and fell, and struck the libelant's left foot, causing the injuries of which he complains.
The libel charges negligence of the owner of the ship, inter alia, in failing to provide suitable and proper gear and rigging, in failing to provide staging and supports necessary in the proper performance of his duty, and generally in failing to provide a safe and secure place for the libelant to perform his duties. The libelant testified that, on the day of the accident, the boiler cover was warped, so that, when his helper attempted to press the cover in at the top, the curve due to the warping caused it to spring *478 out at the bottom, thereby, in turn causing it to slip off its rests and to fall. He called witnesses who testified to my satisfaction, from their experience with covers for similar boilers, that it is contrary to usual practice and unsafe for one, engaged in the libelant's occupation at the time, to have to work upon a platform constructed so far below the bottom of the boiler that, owing to the slant at which the plate lay, it was impossible, if it should slip and fall, for one standing on a platform thus constructed to avoid being struck by it.
It was shown, however, by witnesses for both parties, that the cover was fitted with two eye-bolts, and that a rope fall and block had been provided for attachment to the beams or pipes overhead, and that the proper practice in placing or replacing the cover was to loop a rope through the eye-bolts, attach the hook of the block and fall to the loop, and for one or more of the men to hold the weight of the plate until the bottom dogs had been sufficiently fastened, and then the upper dogs and those on the sides had been fastened. The libelant testified that there was such a block and fall provided, but that, owing to the heat to which the rope was exposed, it had become deteriorated and unsafe for use. Although the libelant had been engaged in removing the cover that same morning and at that time, according to his statement, he saw the defective condition of the rope, he did not call the attention of the second engineer, who had ordered him to do the work, nor of any one to that fact, nor did he attempt to secure a safe and proper rope to replace the one which he claims was unsafe, and which he states he failed to use for that reason. When he signed with the ship, he was, according to the engineer, an experienced water tender, having exhibited his discharge papers certifying to that fact at the time of signing on. He must be presumed, therefore, to have been acquainted with his duties, and, being in charge of the work, it is clear that it was his duty, even if he was not called upon to test the rope, to ascertain whether it was safe, to have either immediately supplied himself with another rope, or to report at once to his superior officer that he had discovered the rope was in an unsafe condition for the work.
I think it is clear, however, that the placing of the staging or platform on which a man had to stand to do his work, so far below the bottom of the cover that a man could not stand there and escape injury if the cover should slip and fall, must be regarded as negligence on the part of the owners of the ship. A vessel must be in all respects seaworthy, which is the equivalent of the common-law duty of providing a servant or employee with a safe place to work. The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760; Ignetti v. Intall & Co. (D. C.) 285 F. 638; Globe S. S. Co. v. Moss, 245 F. 54, 157 C. C. A. 350. The position of the cover, when attempt was made to put it in place, was such that the vertical line of the bulwark and stiffening and the slanting of the frame on which the cover lay converged, so that, if the cover should fall, there was no possibility for one standing on the low, narrow platform to escape the falling cover. There is no evidence to show that any other platform was provided, and it cannot be successfully contended on the part of the respondent that it was the duty of the libelant to provide himself a safe platform, which was a permanent structure, whatever might be his duty in relation to movable rigging such as the block and fall.
I am not satisfied from the evidence that the libelant has sustained the burden of proof in showing that there was negligence on the part of the ship in failing to provide a safe and proper block and fall, but there is sufficient in the evidence to show that he was guilty of contributory negligence in proceeding to do his work without using the appliance provided for his safety, or, if it was unsafe, in not taking steps immediately to procure a safe and proper one. If a proper block and fall had been used, the accident would not have happened, and therefore his own negligence was a contributing cause of the accident.
I am of the opinion, therefore, that the accident was caused partly by the negligence of the owner and partly by the negligence of the libelant. In admiralty, the rule in such a case is that the libelant is not precluded from recovery, but that the damages caused by the injury may be divided. The Max Morris, 137 U. S. 1, 11 S. Ct. 29, 34 L. Ed. 586. Applying that rule, a decree will be entered in favor of the libelant for one-half of the damages accruing to him by reason of his injury, consisting of an award for his pain and suffering and his loss of earnings, owing to his lameness caused by the accident, and the expense of being cured.
In fixing the damages, I take into consideration the fact that the libelant remained in the hospital for a period of nearly five months, during which time, and up *479 to January 1, 1922, there was a total loss of earnings; the further fact that he was not discharged cured, and that, owing to his lameness, he has incurred a loss of earning power; that some lameness still remains, which may be cured by an operation, which will probably remove his lameness, but the expense of which he will have to defray; and the loss of earnings during the time he may be disabled during the operation; and taking into consideration, as an element affecting his damages, the time during which the loss of wages has occurred, also in diminution the fact that he may not have been able to obtain constant employment, I fix as an amount which will reasonably compensate him the sum of $2,400, and the amount for which a decree will be entered $1,200, the costs of both parties to be borne by the respondent.