## SOUTHERN RY. CO. v. HERMANS.
### No. 3009.

Circuit Court of Appeals, Fourth Circuit.
Oct. 21, 1930.

NORTHCOTT, Circuit Judge, dissenting.

James H. Corbitt, of Suffolk, Va., and Thomas B. Gay, of Richmond, Va., for appellant.

John W. Oast, Jr., of Norfolk, Va., for appellee.

Before NORTHCOTT, Circuit Judge, and WATKINS and SOPER, District Judges.

SOPER, District Judge.

This action at law was brought under the provisions of section 688 of title 46 of the United States Code (46 USCA § 688) to recover damages for the death of Leo Antone Hermans, which resulted from personal injuries suffered by him in the course of his employment as a seaman on the defendant's tug or steamer Memphis on September 7, 1929, in the harbor of Norfolk, Va. The deceased was caught between the tug, on which he was a deck hand, and a barge which was about to be taken in tow, and was so badly crushed and mangled that he died on September 12, 1929. The jury found a verdict in the plaintiff's favor for $15,000 and judgment was entered thereon, whereupon the defendant appealed, complaining of errors of law by the trial court, and especially of the refusal of the court to direct a verdict in the defendant's favor.

The accident took place during a maneuver in which the tug was endeavoring to pull the barge out of a slip in the east branch of the Elizabeth river. The tug nosed up to the end of the barge whereupon Hermans, the deceased, and another deck hand, Allen Smith by name, went upon the barge in order to attach lines to enable the tug to pull it out of the slip. There were two lines—the barge line, which was handled by Smith, and the tug line, which was handled by Hermans. He put the tug line over a bit on the corner of the barge on the starboard side, while Smith attached the other line to a bit on the port side of the barge. The tug then backed away, jerking the barge out into the stream. When this had been accomplished, the master in the pilot house gave one toot on the whistle, which was the customary signal, as everybody understood, for the deck hands to detach the lines from the bits so that the tug and barge might assume a position side by side and proceed thus across the river. When the signal was given, Smith pulled in the barge line and went aboard the tug, and it then became the duty of Hermans to detach the tug's line, and attach it to a bit on the starboard side at the forward end of the barge. In the meantime, the engines of the tug were stopped and then given a slight impulse forward, whereupon the tug was caused to stop or to proceed very slowly ahead whilst the barge came slowly astern, so that the port side of the tug and the starboard side of the barge were adjacent.

The evidence shows that it was possible for Hermans to have transferred the tug's line to the forward bit on the barge in several different ways. He could have stepped back upon the tug with the line, waited until the vessel came along side the barge, and then gone a second time upon the barge to attach the line; or he could have remained on the barge and gone from one end to the other by ascending to the roof of the house on the barge at one end and descending at the other; or he could have proceeded from one end to the other along a narrow walkway some 12 inches wide on the port side of the barge alongside of the house thereon. He took none of these ways, but pursued the more convenient method of proceeding along a similar narrow walkway on the starboard side of the barge with the rope in his hand. The evidence is undisputed that this was the usual way in which the deck hand did the work, and that the crew of the tug were well aware of this custom.

On the occasion in question, as the vessels were approaching a side by side position and Hermans had gotten to a point on the starboard walkway on the barge about 2 feet aft the center doorway in the house of the barge, he was caught between the side of the house and two projecting guards which consisted of wooden strips attached longitudinally to the hull of the tug and extending outwardly therefrom from 6 to 8 inches. The result, as has been stated, was that he was so badly crushed that he survived only a few days.

The accident was doubtless made possible at least in part by the important fact that when the vessels approached each other, the captain at his station in the pilot house tug could not see Hermans or the port side of the tug at the point at which it came in contact with the barge. This circumstance resulted from the construction of the tug which was in fact a small steamer equipped with a saloon or upper deck intervening between the pilot house and the deck below, and shutting off a view of the point of contact. It was, of course, possible for other members of the deck crew, consisting of the mate and the other deck hand, who were on the deck below, to see the side of the barge as the tug approached; but they were concerned with other duties, and it is admitted that they were not expected to act as a lookout of the tug during the maneuver, and in fact did not see that the deceased was in a position of danger until it was too late. There was nothing unusual in this situation, for it is conceded that the maneuver was always performed without

any lookout except in so far as the seaman carrying forward the line on the barge was expected not only to look out for his own safety, but also to communicate with the master in the pilot house if such communication should become necessary. In short, it was the recognized custom for the deck hand to take care of himself as the boats approached a parallel position. This method had been employed on numberless occasions previous to the accident by the crew of the Memphis, and hundreds of times the tug was used in connection with the very barge which figured in the accident in question or other barges of similar shape and size. Hermans, the deceased deck hand, was an experienced seaman, 25 years of age, and had been employed on the tug for more than a year during which time he had participated in precisely similar maneuvers on numerous occasions. There can be no question, therefore, but that he clearly understood the nature of the work. He knew that the master in the pilot house could not see the deck hand carrying forward the line on the side of the barge as the vessels approached one another, and that the deck hand was the only lookout on the tug while the operation was going on and was supposed to look out for his own safety. In short, Hermans was thoroughly informed as to the risks ordinarily attendant upon these circumstances.

One of the dangers involved was the practical impossibility of preventing contact between the side of the tug and the side of the barge as the vessels came together. The testimony shows that from 85 to 90 per cent. of the times when similar operations were performed, such contact took place and that such must necessarily have been the case is easily understood. It is, however, not perfectly clear that the contact between the vessels on the occasion in question took place in the ordinary manner, which could have been foreseen by the deceased seaman. It will have been noted that the projecting guards, attached to the hull of the tug, reached over the walk on the side of the barge so that the man was crushed between the guards and the house on the barge. The point of contact on the tug was some 10 feet aft of the stem of the vessel, and at this point, by reason of a certain rake or lift of the bow of the vessel, the guards stood at a higher point from the surface of the water than they reached amidships. The photographs of the vessels seem to indicate that had the tug and the barge come alongside one another in substantially parallel courses, the guards on the port side of the tug would have approached the starboard side of the barge at a line below the deck of the barge, and consequently room would have been left for a man standing on the narrow walkway at or about the center of the vessel. The master of the boat testified that he knew that the guards of the Memphis might reach over and hit the house of the barge, and he supposed that the deck hand also knew this fact. But the evidence shows that although in the great majority of instances some contact of the vessels took place during the operation, ordinarily the guard rails did not strike the house of the barge. Whether the danger from the projecting guards was so obvious to the deck hand that he should be charged with the same responsibility for such an event as for the other more ordinary risks involved in the frequent contacts between the vessels is one of the important questions in this case.

The plaintiff relied upon the members of the crew of the tug in order to prove the case, and hence nearly all of the evidence is undisputed. There is indeed only one point worthy of note upon which a difference arose. The plaintiff produced two expert seamen who testified in substance that under the circumstances of the maneuver, it would have been good seamanship for the master to have left the wheel in the pilot house unattended as the vessels approached one another, and to have taken a position at a bell pull at the rail of the tug by which he would have communicated with the engine room; and that if he had done so, he could have seen the danger in which the deceased was placed and have taken steps to avoid the injury. On the other hand, there was contradictory expert testimony to the effect that the captain's place was in the pilot house, and that if he remained in that position, he was the better able to give protection to the deck hand on the barge. The significance of this conflict of expert opinion we shall hereafter consider.

This recital of the facts shows the grounds for the conflicting theories of law which the respective parties would apply to this case. The plaintiff says that the accident was caused by the negligent failure of the defendant to provide the deceased with a reasonably safe place to do his work. The defendant on its part contends that it was not negligent in this respect, and that in any event the risks incident to the employment had become perfectly obvious to Hermans during the course of a year, and had been voluntarily assumed by him. The defendant also says that it is absolved from liability because Her-

mans disregarded other safe methods of doing the work and voluntarily adopted the only way which was likely to endanger his safety. It is manifest, however, that the latter point is not a conclusive answer to the plaintiff's suit. It serves only to show that Hermans took the path of danger of his own accord, and not under those circumstances of compulsion which negative assumption of the risk by seamen engaged in hazardous occupations at sea. Globe S. S. Co. v. Moss (C. C. A.) 245 F. 54; Cricket S. S. Co. v. Parry (C. C. A.) 263 F. 523. Hermans proceeded along the walkway which the deck hands had used on countless occasions during a long period with the knowledge and consent of the navigators of the tug; and hence it is beyond question that the defendant should have taken care to make safe the place where the deceased was injured, as far as the circumstances of the business would permit.

The District Judge decided that there was sufficient evidence of defendant's negligence for the consideration of the jury, and in our opinion this conclusion was correct. There was not only the plaintiff's expert testimony that the master could have left the pilot house during the maneuver, but more important is the admitted fact that no lookout other than the deck hand himself was provided to offset the master's lack of vision. It was clearly a matter for the jury to determine whether the intrusting of this responsibility to the deck hand charged with other duties was an adequate performance of the defendant's duty to exercise reasonable care to furnish its employees with a reasonably safe place in which to work.

The more difficult question is whether the defendant should have been given a verdict under the doctrine of the assumption of the risk. This rule is sometimes criticized as unjust and harsh by those who believe that the freedom of an employee to contract is ofttimes a theory rather than an actuality; but it has the support of numberless decisions in the state and federal courts (see 39 C. J. 726); and Congress by its action has retained the doctrine as a defense available to employers in cases of this sort. Section 688 of title 46 of the United States Code (46 USCA § 688) gives to any seaman, who shall suffer personal injury in the course of his employment, and to his personal representatives, if death ensues, the right to maintain an action at law with the right of trial by jury, and provides that in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply. Such a statute is the Federal Employers' Liability Act (35 Stat. 65, c. 149; U. S. Code, title 45, §§ 51–59 [45 USCA §§ 51–59]), which provides in section 4, U. S. Code, title 45, § 54 (45 USCA § 54), that an employee of a common carrier in interstate commerce shall not be held to have assumed the risk of his employment in any case where the violation by the carrier of any statute enacted for the safety of employees contributed to the injury or death. The Supreme Court has held that Congress, by eliminating the defense of assumption of the risk in the cases indicated, quite plainly intended that in all other cases such assumption should have its former effect as a complete bar to the action. Seaboard Air Line Ry. v. Horton, 233 U. S. 492, 503, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. There is no claim in this case of violation of any statute, and hence the ordinary common-law rule must be given effect. In the cited case, the Supreme Court defined the rule and held that it applies in cases under the Federal Employers' Liability Act, even though the master has been guilty of negligence. It said (233 U. S. 493, 504, 34 S. Ct. 635, 640):

"The assumption of risk, even though the risk be obvious, may be free from any suggestion of fault or negligence on the part of the employee. The risks may be present, notwithstanding the exercise of all reasonable care on his part. Some employments are necessarily fraught with danger to the workman,—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this court."

See also Boldt v. Pennsylvania Railroad, 245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385;

Pryor v. Williams, 254 U. S. 43, 41 S. Ct. 36, 65 L. Ed. 120.

Relying on these decisions, the defendant in the instant case contends that even if it was negligent in its duty to provide a safe place to work, the consequent risks were so obvious and so well known to the deceased that he must be taken to have assumed them, and hence that the District Judge should have directed a verdict in its behalf. This action the District Judge declined to take. He began his charge to the jury with certain general statements as to the respective contentions of the parties to the cause, and as to the duty of the employer to furnish the employee a safe place to work, and of the latter to exercise care for his own safety, and spoke in general terms of the doctrine of assumption of the risk. He then told the jury in substance and effect that if the deceased was injured because he voluntarily placed himself in a position of obvious danger created by the circumstance that the captain in the pilot house could not see the deceased on the barge as the tug came alongside, the plaintiff could not recover; but if, on the other hand, the danger grew out of the improper or unusual handling of the boats, or if the captain of the tug knew, or by the exercise of reasonable care could have known, that the deceased was in a position of danger on the side of the barge, but failed to use reasonable care for his safety whereby he was injured, the plaintiff was entitled to recover.

The judge added that there was another point to be brought to the jury's attention. He said in substance that the duty upon the defendant to exercise due care to ascertain whether the deceased was in a position of danger, and to avoid the injury, involved the question whether the master should have left the pilot house and gone to the side of the tug as it neared the barge; and if the jury found that the master, while operating the tug, could have taken this position, but failed to do so, and thereby the injury was brought about, the defendant was liable. The determination of the case, he said, depended upon the question whether the tug was maneuvered in a negligent manner, and if the jury should so determine, its next inquiry was whether the deceased used a method which was obviously dangerous. If it so found, the plaintiff could not recover. If, on the other hand, the jury believed that the deceased was engaged in ordinary work that imposed no particular danger, unless some negligence of the defendant in bringing the boats together supervened, and this act caused the injury, then the plaintiff was entitled to recover.

It is obvious that the well-established rules applicable to cases of negligence were in the mind of the court, and were referred to in various parts of the charge as delivered. But we are not satisfied that the rules applicable to the case at bar were made sufficiently clear to a jury unlearned in the law. It must be borne in mind that the negligence charged by the plaintiff, to wit, the defendant's failure to have a proper lookout, was not a new or unusual circumstance, but characterized the performance of the maneuver on countless previous occasions when the deceased took part, and also that the risks ordinarily attendant thereon, including contact between the vessels as they approached, were obvious to the deceased. Hence there were strong reasons for a directed verdict for the defendant, unless it should appear that some unusual circumstance took place or some unexpected danger was encountered on the occasion of the injury. We think that it was not made plain to the jury that their verdict might be in defendant's favor despite the defendant's negligence. Portions of the charge suggest that if the accident occurred because Hermans put himself in a position of danger, the plaintiff could not recover; but if it happened because the captain himself failed to exercise reasonable care for the safety of the deck hand, the plaintiff was entitled to a verdict. The jury should have been explicitly told that even if they found negligence on the part of the captain, still the plaintiff could not recover if Hermans clearly understood the risks attendant upon such negligence and voluntarily assumed them.

We are of the opinion that the plaintiff should not recover in this case unless it should appear to the jury that the particular fashion in which the vessels came together created a danger which theretofore was not clearly obvious to the deceased. The attention of the jury should be specifically drawn to this issue. The deceased knew that in a large majority of instances contact between the boats took place before they were made fast together, and he was necessarily aware of the risks involved in such contact. Hence the only open question left for the jury to decide is whether the approach of the tug, at such an angle to the barge that the guards on the tug near the bow were presented at a point so high as to reach over the deck and come up against the house of the barge, constituted a circumstance and a danger so unusual that it would be unreasonable to conclude that it was obvious to the deceased. These matters we think should be submitted to the jury at a new trial of the case.

We think also that upon the facts as presented at the trial below, the question of contributory negligence should have been submitted to the jury. The deceased, having accepted the duty of looking out for himself, should have taken care to perform it, and even if the jury find negligence on the part of the defendant in failing to provide a safe place for its employee, they should consider whether the deceased took reasonable care to escape injury from the approaching boat. The effect of a finding of contributory negligence in diminishing the damages but not barring recovery, is set out in U. S. Code, title 45, § 53 (45 USCA § 53).

Our attention was called at the argument to evidence offered by the plaintiff to assist the jury in arriving at the amount of pecuniary loss suffered by the family of the deceased by reason of his death. It was shown, by reference of mortality tables, that the life expectancy of a man of the age and physical condition of the deceased was 38.81 years, and this evidence was of course pertinent to the issue. But there was no evidence offered as to the expectancy of life of the beneficiaries, and the defendant contended, therefore, that there was no proof upon which the jury could base a reasonable verdict. Without passing upon this point, it is sufficient to say that it would have been better practice to introduce evidence on this point not only as to the deceased but also as to the beneficiaries.

Reversed and remanded.

NORTHCOTT, Circuit Judge, dissents.