## THE IPSWICH.

### MARQUINA v. LANCASTER S. S. CORPORATION et al.

No. 1808.

District Court, D. Maryland.
Dec. 11, 1930.

Sol C. Berenholtz, of Baltimore, Md., for libelant.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for defendant.

SOPER, District Judge.

Manuel Marquina brings this suit against the steamship Ipswich and the corporations which are respectively the owner and the operator of the steamship in merchant trade. He was employed as a water tender on the ship, and was injured at San Diego, Cal., on January 11, 1930, in the engine room of the ship while attempting to open a valve which controlled the supply of fuel oil. An alarm bell had rung automatically, indicating that the oil was running low, and that it was an urgent matter to open the valve so that the supply of oil might be increased. If this were not done within a short period, say, two minutes, serious damage to the machinery would result.

The libelant, on hearing the bell, while in the boiler room, hastened to the adjoining engine room, and, seeing no one there, according to his testimony, mounted upon certain appliances or pumps below the valve in order to reach it and open it. The valve was seven feet above the floor of the engine room, and, as the libelant was a very short man, only four feet ten and a half inches high, he could not reach the valve from the floor. Accordingly he stepped up some three feet, resting one foot on one appliance and the other on another appliance some distance away, and reached up to open the valve. He testified that at first he held with one hand to an adjacent pipe and with the other endeavored to open the valve, but found it too tight to be opened in this way, so he used both hands, and thereupon the valve opened rather quickly, and he lost his balance and fell to the floor of the engine room. As a result he sustained an impacted fracture of the lower end of the left radius and styloid process of the ulna. This is now well healed, but there is some thickening through the left wrist joint, resulting in a 20 per cent. loss of normal motion of the left wrist, which is most likely to be permanent in its nature.

The first question to be decided in the case is whether this injury involved a breach of duty owing to the seaman by his employer, so that the libelant may be entitled to recover damages in this suit. The theory of the libelant is that he was not supplied with a safe place to work, and that this omission on the part of the employer was the proximate cause of his injury. In considering whether or not a safe place to work was provided, the court may first examine the situation in which the libelant found himself in attempting to do the work. The position in which he stood

while opening the value or attempting to open it was somewhat precarious. The surfaces upon which his feet were resting were not provided for the purpose, and he was in a position in which a man might well lose his balance and fall. It does not necessarily follow that this circumstance shows a neglect of duty on the part of the ship or of the owner, because the place or places upon which the libelant stood were not intended to be used, and it is not clear that his employer was under an obligation to furnish a place suitable to his peculiar stature.

The uncontradicted evidence in the case shows that the valve could be reached from the floor of the engine room by a man of average height. An oiler on the ship and the first assistant engineer were each five feet nine inches tall, and they could reach the valve from the floor of the engine room. The libelant himself testified that a tall man could reach the valve from the floor of the engine room, and that other men, not so tall, could reach it by standing on a valve control which was located close to the floor of the engine room underneath the valve in question. This valve control was the usual circular wheel, hand-operated contrivance, which stood two or three inches from the floor when the valve was closed, and five or six inches when the valve was open. Hence it is obvious that the overhead valve in question was reasonably safe for all men except those of extraordinarily low stature.

The libelant, however, points out to testimony which shows that he had performed this operation on previous occasions, to the knowledge of the ship's officers. The ship's officer in control of the engine room on the occasion of the injury was the first assistant engineer. He said that it was primarily his duty to open the valve when the alarm bell rang, but that such an emergency was well known to the libelant, an old hand on that boat, and to others in the engine room crew, and that it was usual for the person who happened to be near it to turn the valve. Hence the libelant argues that it was known to the officers of the ship from these circumstances that he himself might on some occasions reach up to turn off or to open the valve, and that, since no safe place was provided for him to perform the operation, he ought to be permitted to recover in this case.

 If it be assumed under these circumstances that, when the ship's officers were away, the libelant might perform the operation from time to time, the next question to be determined is whether the libelant assumed the risk of his employment. It is of course the law that the employer exercise due care to furnish a safe place to work, and that a breach of this duty ordinarily gives the injured employee a right of action. But it is equally the law laid down by the Supreme Court of the United States that, if the employer neglects this duty, and the defect and risk involved in the neglect are obvious to an ordinarily prudent person under the circumstances, and would be observed and appreciated by such persons, he assumes the risk, even though it flows from the neglect of duty. Southern Ry. Co. v. Hermans (C. C. A. 4th Circuit) 44 F.(2d) 366, decided October 21, 1930.

It is clear in this case that this experienced man, who had been on the ship for some eight years, and a seaman for some thirty-four years, must have known, as indeed any person would, that some danger was involved in standing upon the machinery and reaching for the valve. The obvious risk was that one might lose his balance and fall, as the libelant did in this case. It is said, however, that the testimony indicates that there was a risk involved which was not obvious, and which grew out of a circumstance that, when he endeavored to open the valve, he found that it was tighter than usual, so tight that he could not open it with one hand, and that he had to use two hands, and that, when he did so, the valve opened quickly, and he lost his balance. The testimony as to the condition of the valve, however, does not permit the court to conclude that the valve was in a bad condition, or in any other condition than one might expect to find it. The libelant does not claim that the valve was defective; and the testimony on the part of the respondent, namely, that of the first assistant engineer, is that, when he went to the valve immediately after the libelant fell, he found it in good condition. There is, indeed, nothing in the evidence to justify the conclusion that the valve was in such condition as to surprise the libelant. As an experienced man with machinery of this sort, he must have known that valves which are turned by hand can be turned more tightly and are turned more tightly at some times than at others; and it must have been clear to him that he was assuming this possibility when he made the attempt. It was brought home to him on this occasion by the fact that he could not open it with one hand when he tried to do so. There was no hidden risk in this case.

138

It has been suggested that the libelant is worthy of commendation for making the attempt on this occasion to open the valve, since he did not see anybody else around to do so. The testimony, however, shows that both the oiler and the assistant engineer, who formed part of the watch of which the libelant was a member, were near enough to have turned off the valve before any harm could be done. The libelant himself said that, while he did not see these men until after he fell, he saw them approaching as he got up from the floor. It doubtless was a commendable thing for the libelant to have endeavored to have performed this service for the ship, but it seems to the court that the case must turn upon the fact that the libelant voluntarily assumed the risk which his physical handicap involved. He was not acting under the compulsion of an order from a superior officer, which, under some circumstances, prevents the application of the doctrine of the assumption of the risk. See Globe S. S. Co. v. Moss (C. C. A.) 245 F. 54; Cricket S. S. v. Parry (C. C. A.) 263 F. 523; Panama R. Co. v. Johnson (C. C. A.) 289 F. 964; Id.' 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748.

The next question is whether the voyage or the term of the employment was over on March 16, 1930, when the vessel had reached the port of Baltimore on its return from the Pacific Coast and had been unloaded, or, on the other hand, lasted for one year from December 13, 1929, when the articles were signed. This question must be determined because the libelant is entitled to wages for the period of the voyage and to maintenance and cure for that period and some reasonable additional time. It is necessary to interpret the opening sentence of the Shipping Articles and notes 1 and 2 appended thereto. These are as follows:

"Office of the ⸗

U. S. Shipping Commissioner for the Port of Baltimore, Md., Dec. 13, 1929.

"It is agreed between the Master and Seamen, or mariners, of the Steamship Ipswich of which A. W. Upson is at present Master, or whoever shall go for Master, now bound from the Port of [1] Baltimore, Md., to Pacific Coast port via Atlanta Coastwise, and such other ports and places in ·any part of the world as the Master may direct, and back to a final port of discharge and/or loading port in the United States on Atlantic or Gulf Coast for a term of time not exceeding 12 calendar months.[2]"

The argument is that the term of service was twelve calendar months, because of the provision in the articles that the steamship was bound from the port of Baltimore to the Pacific Coast and back to a final port of discharge in the United States on the Atlantic Coast for a term of time not exceeding twelve calendar months. Note 2 suggests that, if the printed words in the form "calendar months" are not needed, they should be stricken out, and it is said that the retention of the words "12 calendar months" in the articles indicates that the voyage was to run for that length of time. Reliance is placed upon the case of the Freeport Sulphur Co. (D. C.) 7 F.(2d) 674. The articles in that case provided that the vessel was bound from Freeport, Tex., to Tampico, Mexico, and return, and was also trading between the United States and Mexico, or the West Indies, and back to a final port of discharge in the United States for a term not exceeding six calendar months. The articles also provided that the employment could be terminated by the master or any seaman at the termination of any voyage by giving thirty-six hours' notice. The court held that wages and maintenance and cure for the duration of the voyage should not be restricted by the technical meaning of the term "voyage," but should include, rather, the term of employment of the seamen, and that in the case under discussion the term of employment was obviously six calendar months, and not a single voyage between Freeport, Tex., and Tampico, Mexico. Similar holding was made in the case of McCarron v. Dominion Atlantic Railway Co. (D. C.) 134 F. 762.

This court agrees with the ruling in these cases upon the facts involved; but those facts are easily distinguishable from those in the case at bar. Here the articles clearly call for a voyage from Baltimore to the Pacific Coast and back to a final port of discharge on the Atlantic Coast. There is, it is true, a limitation of twelve months, but this can be given full weight and meaning by the determination that the voyage should not, in any event, last more than twelve months. In short, the court holds as a conclusion of law that this voyage ended when the vessel came

---

[1] Here the voyage is ·to be described, and the places named at which the ship is to touch; or, if that cannot be done, the general nature and probable length of the voyage is to be stated, and the port or country at which the voyage is to terminate."

[2] If these words are not necessary, they must be stricken out."

back to a final port of discharge in this country on the Atlantic Coast, and the vessel was discharged. See the Velma L. Hamlin (C. C. A.) 40 F.(2d) 852; The Edwin (D. C.) 23 F. 255, 257.

The testimony on this point shows that the vessel on its return voyage from the Pacific Coast sailed from Long View, Wash., loaded with lumber, to Newark, N. J., where it arrived on March 3, 1930; that it discharged its cargo between March 3 and March 13; and then sailed from Newark to Baltimore, light, arriving on or about March 16, on which last-mentioned date the crew were paid off at Baltimore. Thereafter the vessel took on a new cargo for the West Coast. Under these circumstances it is clear that the voyage ended on March 16, 1930, and that the wages should stop as of that date.

■ There remains the question of maintenance. It was decided in The Bouker No. 2 (C. C. A.) 241 F. 831, that the term of maintenance and cure may be extended for a reasonable period beyond the expiration of the voyage. The difference between the contentions of the respective parties in the case at bar on this point is not great. The testimony shows that the libelant was cared for in the hospital at San Pedro from the day of his accident until April 7, when he was brought back to the Atlantic Coast on another vessel of the respondents, arriving in Baltimore on May 6. Between the date of his accident on January 11 and April 7, or for the greater part of this time, the libelant was an out patient at the hospital at San Pedro. Between April 7 and May 6, he was on the ship, returning to the port of Baltimore, and between May 6 and June 6 he was an out patient at the Marine Hospital in Baltimore. On June 6 he was discharged by the hospital authorities. The respondents concede that the libelant is entitled to maintenance up to June 6, 1930, although the voyage was over on March 16, 1930. The libelant contends that he should be allowed additional time, perhaps thirty days.

The testimony is rather vague as to the condition of the man on June 6, 1930, as compared with what it was, say, thirty days later, or is to-day. There is perhaps some permanent injury to hand, but the respondents are not bound to pay for this. No doctors have been produced on either side to testify as to the condition of the hand on June 6, and the only circumstance of which the court is certain is that he was discharged by the hospital as needing no further treatment on that

day. He had not been bedridden, but had been an out patient from shortly after the accident on January 11 until June 6. There is nothing to indicate that his discharge on June 6 was premature, and hence the court concludes that, if the libelant is paid maintenance up to that date, that is as much as the evidence justifies. It is conceded that the libelant is also entitled to wages to March 16, 1930.

A decree in accordance with this opinion will be signed.